278 Neb. 115
STATE OF NEBRASKA, APPELLEE,
v.
BART G. HILDING, APPELLANT.
No. S-08-585.
Supreme Court of Nebraska.
Filed July 17, 2009.
Dennis R. Keefe, Lancaster County Public Defender, and Matthew G. Graff for appellant.
Jon Bruning, Attorney General, and Erin E. Leuenberger for appellee.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
MILLER-LERMAN, J.

NATURE OF CASE
Bart G. Hilding appeals his convictions and sentences for two counts of first degree sexual assault and one count of stalking. Hilding asserts, inter alia, that the district court for Lancaster County erred in overruling his motion to suppress statements he made in a police interview, overruling his motion to sever the stalking charge from the sexual assault charges for purposes of trial, and finding that the sexual assaults were aggravated offenses and therefore ordering him to be subject to lifetime registration and lifetime supervision. We affirm Hilding's convictions and sentences.

STATEMENT OF FACTS
Hilding and M.S. began a relationship in 2005. The two lived together for a time, but Hilding moved out after difficulties arose. The relationship continued for some time thereafter, but according to M.S., the sexual relationship ended and became more of a friendship by January 2007.
At approximately 4:30 a.m. on April 27, 2007, M.S. reported to police that Hilding had sexually assaulted her in her apartment. M.S. later reported that Hilding had also sexually assaulted her on April 6 and that he had been harassing her in the months since they had broken up. As part of their investigation of the reported assaults, police officers provided M.S. with equipment to record her subsequent telephone calls with Hilding. The State later charged Hilding with two counts of first degree sexual assault in violation of Neb. Rev. Stat. § 28-319 (Reissue 2008) and one count of stalking in violation of Neb. Rev. Stat. § 28-311.03 (Reissue 2008).
Hilding was arrested on May 5, 2007. He was taken to the Lincoln Police Department and placed in an interview room. Hilding was given Miranda warnings by Sgt. Robert Farber, and Hilding signed a "Miranda Warning and Waiver" form in which he acknowledged that he understood his rights and that he was willing to answer questions or make a statement. Farber questioned Hilding about his relationship with M.S. and his recent contacts with her. At one point during the questioning, Hilding said, "I don't know exactly what you're leading up [to], and I'm telling you I probably shouldn't be answering any of these questions." However, Hilding continued to answer Farber's questions. Later in the interview, after Farber told Hilding that M.S. had "a completely different version of this story" regarding the April 27 incident, Hilding said, "Okay. See and this is why I probably shouldn't be talking about this. I probably should have an attorney." Farber continued the interview, and Hilding again continued to answer questions until Farber ended the interview.
Prior to trial, Hilding filed a motion to suppress the statements he made to police. The court overruled the motion with respect to Hilding's May 5, 2007, interview with Farber. The court found that Hilding had been informed of his Miranda rights; that his waiver of such rights was made knowingly, intelligently, and freely; and that his statements were made knowingly, voluntarily, and intelligently and were not induced by promises or obtained as a result of force, fear, oppression, or coercion. The court also found that Hilding "never requested to be permitted to talk to an attorney, never indicated that he did not want to continue with the interview and never raised this issue again." The court specifically found that Hilding's comments that he "probably shouldn't be talking about this" and "probably should have an attorney" were not requests to cease the interview or requests for an attorney. A video recording and a transcript of the May 5 interview were admitted into evidence at trial over Hilding's objection.
Also prior to trial, Hilding filed a motion to sever the charge of stalking from the sexual assault charges for purposes of trial. The court overruled the motion to sever.
A jury trial was held February 20 through 27, 2008. The court recessed the trial for the weekend on Friday, February 22, after the State had begun presenting its evidence. When the trial resumed on Monday, February 25, the court announced that one of the jurors was ill with the flu and had a sinus infection. Hilding requested a recess until the next day to see if the juror's condition would improve; however, the court determined that it was best to continue the trial with an alternate juror replacing the juror who was ill. Hilding did not thereafter object to the court's decision, and the trial resumed.
At trial, the State's main witness was M.S. She testified that she began dating Hilding in March 2005 and that they moved in together in March 2006. The two began having problems in their relationship, and Hilding moved out in August. However, they continued to work on the relationship and continued a sexual relationship for some months afterward.
When M.S. learned in December 2006 that Hilding was dating another woman, she decided that her relationship with Hilding was over. She communicated this to Hilding, but between January and March 2007, Hilding continued to make frequent telephone calls to her. She thought his purpose was to keep tabs on her and to find out whether she was dating other men. M.S. testified that she was determined to continue a friendship with Hilding "because it was easier to stay his friend and to take his phone calls than to not take his phone calls." During that period, M.S. met socially with Hilding in public places, but she did not want to be alone with him because she did not want to feel pressure to have sex with him.
On the evening of April 5, 2007, M.S. worked the closing shift as a bartender at a sports bar. At approximately 10 p.m., Hilding came to the bar with flowers for her. Hilding stayed at the bar, and M.S. served him drinks. After some time, M.S. determined that Hilding had had enough to drink; she and Hilding argued because he wanted more drinks. At closing time, M.S. told Hilding he needed to leave the bar. He tried to stay to talk to her, but he eventually left. When M.S. took trash outside, Hilding was at the side of the bar wanting to talk to her. She told him he needed to leave, and she went back into the bar.
When M.S. finished work, she went to her car and noticed that there was some damage to the vehicle and that some cash had been left on the windshield. M.S. suspected that Hilding had caused the damage and had left the cash, because earlier in the evening, he had talked about damaging her car so that she could collect insurance money. He had also told her that he had cash he could use to pay money he owed her. M.S. called Hilding to ask whether he had hit her car. He denied hitting her car but admitted that he had left the money on her windshield.
After reporting the damage to her car to police, M.S. returned home between 1 and 2 a.m. on April 6, 2007. When she pulled into the parking lot for her apartment, Hilding approached her car and said he wanted to inspect the damage. He again denied that he had hit her car. M.S. told Hilding she was mad at him and wanted him to go home. Hilding asked whether he could come up to her apartment to charge his cellular telephone. M.S. refused, but Hilding insisted that they go up to the apartment, and he grabbed her coat and pushed and prodded her to her apartment door.
When they got inside the apartment, Hilding told her to go to the bedroom. She initially refused but eventually complied because she was scared of what he might do. When they reached the bedroom, he told her to take off her shirt. She again refused but eventually complied out of fear. She continued to tell him that he needed to leave, and she threatened to call the police. Hilding grabbed her cellular telephone, snapped it in half and threw it across the room. Hilding insisted that M.S. retrieve his cellular telephone charger; in the course of his so insisting and M.S.' retrieving the charger, Hilding hit M.S.' arm and kicked her in the lower back. Hilding told M.S. to take off her pants and said that they were going to have sex. She was crying and told him she did not want to, but he took off her jeans and underwear and pushed her onto the bed. Hilding forced M.S. to have sexual intercourse with him, forced her to perform oral sex on him, and performed oral sex on her. At times, Hilding told M.S. to be quiet and used his hands or a pillow to muffle her because she was crying and telling him to stop. Hilding eventually stopped and fell asleep, but M.S. could not leave because he was on top of her.
When M.S.' alarm clock went off at 6:30 a.m., she woke Hilding and told him he needed to leave because she needed to go to her daytime job at a radio station. While they were getting ready to leave, Hilding said he hoped M.S. was not mad at him, that he did not want to hurt her, and that he hoped she would not "turn him in." Hilding left the apartment when M.S. left for work. As they parted, M.S. told Hilding that she did not want to ever talk to him again. M.S. did not call the police after the April 6, 2007, incident because she was embarrassed and scared and thought that Hilding would leave her alone. Approximately a week later, Hilding again began making frequent telephone calls to M.S. Although M.S. told Hilding she was mad about what had happened and did not want to talk to him anymore, Hilding would not discuss the incident and acted as if it had not happened.
On the evening of April 26, 2007, M.S. finished work at the bar at approximately 9 p.m. Hilding had called M.S. earlier that day to see what she was doing that night, and she told him she was working all night. After she left work, she went to other bars with friends. After the bars closed, M.S. went to the home of a male friend, and they had consensual sex. She did not stay the night with him but instead returned to her apartment because she had to work the next day.
When M.S. arrived home at approximately 2:30 a.m. on April 27, 2007, she parked her car and, while she was walking toward her apartment building, saw Hilding in the parking lot. She ran to her apartment to try to get inside and avoid him. Hilding ran after her and caught up to her just as she entered her apartment. Hilding kept her from closing the door and forced his way into the apartment. He asked M.S. what she had done that night and whether she had had sex with anyone. She denied that she had. Hilding pushed her to the floor and took down her pants and underwear and said that he wanted to smell her vagina to determine whether she had had sex with another man. He did so and then told her that they were going to have sex and that she should choose whether she wanted to do it in the bed or in the shower. She told him she did not want to have sex, but he insisted that she choose the bed or the shower. She told him she had to use the bathroom and he followed her there. He eventually coerced her to undress and get into the shower where he forced her to engage in sexual intercourse. M.S. cried throughout the incident and told Hilding she did not want to have sex.
After they got out of the shower, Hilding made comments to M.S. indicating that he had seen her at a bar earlier that evening, but she had not seen him there. Hilding told M.S. to give him her cellular telephone because he wanted to delete voice mails he had left for her. He forced M.S. to tell him the code to delete the voice mails by threatening to kill her cat if she did not tell him. As Hilding looked through the list of incoming calls, he questioned M.S. regarding calls she had received from other men, and he wrote down the men's telephone numbers. Hilding left the apartment at approximately 4:30 a.m., and M.S. called the police to report the assault. She also called some of the men whose telephone numbers Hilding had written down because she was afraid he might contact the men and try to harm them.
Police officers came to M.S.' apartment to interview her and to take her to a hospital for an examination. As part of the investigation, the police gave M.S. equipment to record the telephone calls with Hilding and conducted a controlled call from M.S. to Hilding a few days after the assault. A recording and a transcript of the conversation were entered into evidence at trial.
In the telephone conversation, M.S. confronted Hilding about his showing up uninvited at her apartment in the early hours of April 27, 2007, and at other times and about his actions after forcing himself into her apartment on April 27. Hilding admitted being at her apartment and having sex with her, but denied that he had forced her to do so. Despite such denial, Hilding told M.S., "I'm sorry for whatever I did that hurt you. I'm sorry for whatever, whatever, whatever."
During the days after the controlled call, Hilding made several more calls to M.S. Recordings and transcripts of the calls were entered into evidence at trial. In the calls, Hilding questioned M.S. about her sexual activity with other men and told her that he thought she had a sexually transmitted disease. Hilding eventually threatened that he would "tell everybody" that M.S. had a sexually transmitted disease. Hilding threatened M.S., saying, "I will fuckin seriously fuck you over so hard you won't even fuckin get it." Hilding also threatened that if M.S. did not agree to meet with him, he would "be over at your house kicking your fucking door in" and that he would "go over to [a male friend of M.S.'] house or I'll kick your fuckin brother in his god damn chest." Hilding stated:
And then I will go out of my way to seriously fuck everybody that you come in regular contact with. You will not only lose your fuckin job at the bar you will probably lose your job at the radio station. I am not in the mood to fuckin play anymore.
In connection with M.S.' testimony, the court, over Hilding's objection, admitted into evidence and published to the jury printed copies of more than 20 e-mails that Hilding sent to M.S. from April 27 through May 4, 2007. The content of the e-mails included apologies for how Hilding had treated M.S., accusations that M.S. had lied to him and that she had contracted a sexually transmitted disease, and threats that he would "tell everybody your little secret." On the printed copy of one of the e-mails in which Hilding asserted that M.S. had contracted a sexually transmitted disease, M.S. made notations to indicate that other addresses to which Hilding had sent the e-mails were addresses that belonged to her friends and relatives. Also included was Hilding's e-mail that he had sent to M.S.' brother accusing her brother of "screwing up" the relationship between Hilding and M.S. Although the court overruled Hilding's objection, the court differentiated between the telephone calls and the e-mails and instructed the jury that the e-mail evidence was received solely in regard to the stalking charge and that the jury was not to consider the e-mails in regard to the sexual assault charges.
Hilding testified at trial in his own defense. He admitted that he had sexual relations with M.S. on April 6 and 27, 2007, but he testified that M.S. consented to such relations. With regard to the April 6 incident, Hilding testified that M.S. invited him up to her apartment and that he did not push or pull her to the apartment. Hilding testified that it was her suggestion that they go to bed together and that she asked him to stay the night. Hilding denied purposefully breaking M.S.' cellular telephone and testified that either he broke it accidentally or it was already broken when he touched it.
With regard to the April 27, 2007, incident, Hilding testified that during the day on April 26, he and M.S. had made plans to meet that night. Hilding spent most of the evening with his girlfriend, but after leaving his girlfriend at her home, he went to M.S.' apartment building. M.S. arrived shortly after he did. Hilding denied chasing M.S. to her apartment and forcing his way into her apartment. He testified instead that she willingly allowed him into the apartment. Hilding testified that M.S. initiated sexual contact by undressing him and leading him to the shower where they engaged in consensual intercourse. They continued to the bedroom, but Hilding eventually left because he realized he should not have been with M.S. and instead should have been with his girlfriend. Hilding testified that M.S. became upset with him when she realized that he was leaving and that prior to that time, she had not been upset or crying.
With regard to his telephone conversations with M.S. after the April 27, 2007, incident, Hilding testified that he was surprised by M.S.' accusations regarding the April 6 and 27 incidents and was suspicious of her purpose in making the accusations. He testified that he accused M.S. of having a sexually transmitted disease, not because he believed she did but because she was making accusations against him and he wanted to respond in kind. Hilding admitted that he was "being an asshole," but described his behavior as a reaction to M.S.' accusations.
The jury found Hilding guilty of both counts of first degree sexual assault and the count of stalking. The court sentenced Hilding to imprisonment for 10 to 16 years on each of his convictions for first degree sexual assault and for 1 year on his conviction for stalking. The court ordered that all three sentences be served consecutive to one another. For purposes of Nebraska's Sex Offender Registration Act, the court found that both convictions for first degree sexual assault were "aggravated offenses" as defined in Neb. Rev. Stat. § 29-4005 (Reissue 2008), and the court therefore ordered that Hilding would be subject to lifetime registration. The court further ordered that pursuant to Neb. Rev. Stat. § 83-174.03(1)(c) (Reissue 2008), Hilding would be subject to lifetime community supervision by the Office of Parole Administration upon release from imprisonment.
Hilding appeals his convictions and sentences.

ASSIGNMENTS OF ERROR
Hilding asserts that the district court erred in (1) overruling his motion to suppress his statements to Farber in the May 5, 2007, interview and admitting the statements into evidence, (2) discharging the juror who became ill, (3) overruling his motion to sever the stalking charge from the sexual assault charges for trial, and (4) finding that he committed aggravated offenses and therefore ordering that he be subject to lifetime registration and lifetime supervision. Hilding also asserts that there was not sufficient evidence to support his convictions and that the court had imposed excessive sentences.

STANDARDS OF REVIEW
[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), we apply a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination. State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[2] The retention or rejection of a juror is a matter of discretion for the trial court. See State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006). This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. See id.
[3] Severance is not a matter of right, and a ruling of the trial court with regard thereto will not be disturbed on appeal absent a showing of prejudice to the defendant. State v. Mowell, 267 Neb. 83, 672 N.W.2d 389 (2003).
[4] Statutory interpretation presents a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. State v. Hamilton, 277 Neb. 593, 763 N.W.2d 731 (2009).
[5,6] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Branch, 277 Neb. 738, 764 N.W.2d 867 (2009). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Id.
[7] Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. Id.

ANALYSIS

The District Court Did Not Err in Overruling the Motion to Suppress Because Hilding Did Not Unambiguously and Unequivocally Invoke His Miranda Rights During the Police Interview.
Hilding first claims that the district court erred when it overruled his motion to suppress the statements he made to Farber in the May 5, 2007, interview and in allowing such statements into evidence at trial. We conclude that the statements were made after Hilding waived his Miranda rights; that Hilding did not thereafter unambiguously and unequivocally invoke his Miranda rights; and that therefore, the court did not err in overruling his motion to suppress such statements and in allowing such statements into evidence.
Hilding directs our attention to two statements and argues that these statements were clear and unambiguous invocations of both his right to remain silent and his right to counsel and that Farber did not scrupulously honor such invocations. In its ruling on the motion to suppress, the court found that in the May 5, 2007, interview, Farber properly informed Hilding of his Miranda rights and that Hilding waived such rights. The court found that Hilding did not make a request to cease the interview or a request for an attorney when he said that he "probably shouldn't be talking about this" and that he "probably should have an attorney."
[8] In order to counter the pressures of a custodial interrogation, the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), "established the familiar Miranda advisements of the right to remain silent and to have an attorney present at questioning." State v. Rogers, 277 Neb. 37, 51, 760 N.W.2d 35, 50 (2009). Once Miranda warnings have been given, an individual has the right to cut off questioning by invoking his or her Miranda rights, and once an individual has invoked the right to cut off questioning, the police are restricted to scrupulously honoring that right. See id. However, before the police are under such a duty, the invocation of the right to cut off questioning must be unambiguous and unequivocal. See id.
In the present case, there is no dispute that Hilding was in custody at the time of the questioning and was therefore entitled to Miranda protections. Compare Montejo v. Louisiana, __ U.S. __, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009) (overruling Michigan v. Jackson, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986) (concerning invocation of right to counsel at arraignment). Further, there is no dispute that he was given proper Miranda warnings and that he initially waived his Miranda rights. The sole issue is whether Hilding invoked his right to cut off questioning, thereby requiring Farber to scrupulously honor that right.
As noted above, invocation of the right to cut off questioning must be unambiguous and unequivocal. In Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the U.S. Supreme Court held that in order to require police to cease questioning until counsel is present, "the suspect must unambiguously request counsel," meaning that he or she "must articulate his [or her] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." However, the Court further stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. In Davis, the Court affirmed the trial court's finding that the defendant's statement, "'Maybe I should talk to a lawyer,'" was not a request for counsel and that therefore, law enforcement officers were not required to stop questioning. 512 U.S. at 462.
In the present case, Hilding's only references to cutting off the interview were when he said, "I probably shouldn't be answering any of these questions," and when he later said, "I probably shouldn't be talking about this." His only reference to counsel during the interview was when he stated that he "probably should have an attorney." These statements are not unambiguous and unequivocal invocations of Miranda rights. Hilding's statements that he "probably shouldn't be talking about this" or answering questions were ambiguous and equivocal in and of themselves, and their equivocal nature was perpetuated when Hilding continued to talk and answer questions immediately after making such statements. Hilding's statement that he "probably should have an attorney" was similar to the defendant's statement in Davis that "'[m]aybe I should talk to a lawyer.'" See 512 U.S. at 462. Because Hilding's statement was ambiguous and equivocal, a reasonable officer under the circumstances would have understood only that Hilding was considering invoking his right to counsel.
Hilding did not unambiguously and unequivocally invoke his right to cut off questioning, and Farber was not required to cease questioning. We therefore conclude that the district court did not err when it overruled Hilding's motion to suppress his statements made in the interview.

The District Court Did Not Err in Discharging a Juror Who Became Ill and Replacing Her With an Alternate Juror.
Hilding asserts that the district court erred when it discharged a juror who became ill after the State began presenting evidence. We conclude that the court did not abuse its discretion by discharging the juror and replacing her with an alternate juror.
After a juror became ill with the flu and a sinus infection, the court decided to continue the trial with an alternate juror. The court stated:
Well, I guess one of the concerns is if we don't recess, then if we lose another juror, we've got a mistrial and we start all over again and I'm of the position, I'm not an expert but I guess it is probably  it may not even be a 50/50 chance that [the juror] will be back tomorrow and we lose a day. We've already lost a half hour so I think it is best that we excuse her and just go ahead and see if we can complete matters this week with the 12 remaining jurors. I guess we'll do that.
Hilding acknowledges on appeal that Neb. Rev. Stat. § 29-2004(2) (Reissue 2008) provides that "[i]f, before the final submission of the cause a regular juror dies or is discharged, the court shall order the alternate juror . . . to take his or her place in the jury box." However, Hilding argues that "discharged" as used in § 29-2004 should be read as referring to cause pursuant to the jury challenge statute, Neb. Rev. Stat. § 29-2006 (Reissue 2008), and that illness is not considered cause for discharge under § 29-2006.
We find nothing which indicates that "discharged" as it is used in § 29-2004(2) refers only to a discharge for one of the causes set forth in § 29-2006. We note in this regard that § 29-2006 does not refer to the "discharge" of a juror, but instead sets forth "good causes for challenge to any person called as a juror or alternate juror." Section 29-2006 deals with challenges to a potential juror, whereas § 29-2004 refers to the discharge of one who has already been chosen as a juror.
[9] Section 29-2004 does not specify the reasons for which a regular juror might be discharged, requiring replacement by an alternate juror. We note, however, that Neb. Rev. Stat. § 29-2023 (Reissue 2008) refers to cases in which the "jury shall be discharged on account of sickness of a juror." We also note that Neb. Rev. Stat. § 25-1117 (Reissue 2008) refers to discharge of the jury "on account of the sickness of a juror." We note further that Neb. Rev. Stat. § 29-1413 (Reissue 2008) provides that "[i]n case of the sickness . . . of any grand juror, after the grand jury shall be affirmed or sworn, it shall be lawful for the court, at its discretion to cause another to be sworn or affirmed in his stead." Long ago, in Catron v. State, 52 Neb. 389, 72 N.W. 354 (1897), this court determined that there was no prejudicial error when a juror was excused because of a sickness in his family and was replaced by a new juror. By reference to other statutes and case law, we logically conclude that a sensible reading of § 29-2004 indicates that a court may discharge a regular juror because of sickness and replace him or her with an alternate juror. See Wooden v. County of Douglas, 275 Neb. 971, 751 N.W.2d 151 (2008) (court will construe statutes relating to same subject matter together so as to maintain consistent and sensible scheme).
The court in this case did not abuse its discretion when it discharged the juror. The court considered a recess until the juror's health improved, but based on the nature of her illness and the potential that an extended recess would cause hardships for other jurors, the court concluded that it was the better course to excuse the juror and continue the trial with the alternate juror. Such decision was within the court's discretion, and we find no merit to Hilding's assignment of error.

The District Court Did Not Err in Overruling Hilding's Motion to Sever Because the Stalking Charge Was Properly Joined With the Sexual Assault Charges and Joinder Did Not Prejudice Hilding.
Hilding next claims that the district court erred when it overruled his motion to sever the stalking charge from the first degree sexual assault charges for purposes of trial. We conclude that the charges were properly joined and that the court did not err when it overruled the motion to sever.
In moving to sever the stalking charge from the sexual assault charges, Hilding asserted that the charges were not related and argued that the inclusion of the stalking charge in the trial for the sexual assaults would expose the jury to irrelevant and unduly prejudicial evidence. The court reasoned that in light of the expected theories of the case, most of the evidence related to the stalking charge would be admissible with regard to the issue of consent in the sexual assault charges and that there was no prejudice in trying all counts together. In this regard, the court stated that Hilding refused "to accept the end of the relationship [with M.S.] and his numerous phone calls, phone messages, etc. are highly relevant to show that he may have been inclined to `take' what may no longer be permissibly bestowed." For completeness, we note that although the court indicated that the evidence of the telephone calls was relevant to both the stalking charge and the sexual assault charges, the court determined that evidence of the e-mails Hilding sent to M.S. related only to the stalking charge and that the court gave the jury a limiting instruction to that effect at trial.
[10] Offenses may be joined pursuant to Neb. Rev. Stat. § 29-2002 (Reissue 2008), which provides:
(1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.
We have set forth a two-stage analysis in which it is determined first, whether the offenses are related and properly joinable under § 29-2002, and second, whether an otherwise proper joinder was prejudicial to the defendant. See State v. Mowell, 267 Neb. 83, 672 N.W.2d 389 (2003).
Offenses are properly joinable under § 29-2002 if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." We determine that the stalking charge and the sexual assault charges are sufficiently related for purposes of joinder. The sexual assaults, as well as the series of telephone calls relating thereto which support the stalking charge, form a series of connected transactions. The April 6 and 27, 2007, incidents were a frequent topic of the telephone calls that occurred after April 27. Hilding admitted that the threats he made in the calls were a response to M.S.' allegations that he had sexually assaulted her.
We further determine that joinder was not prejudicial to Hilding because the facts generally related to the stalking charge would have been admissible in a trial of the sexual assault charges. See Mowell, supra. The evidence of the telephone calls between Hilding and M.S. after the April 27, 2007, incident supports the stalking charge but is also relevant to the issue of consent in connection with the sexual assault charges. Hilding and M.S. discussed the April 6 and 27 incidents in the calls, and the calls demonstrate the nature of the relationship between Hilding and M.S. and would provide some evidence for the jury to determine whether or not M.S. consented to sexual activity with Hilding.
We conclude that the stalking charge and the sexual assault charges were properly joined and that joinder did not prejudice Hilding. The district court therefore did not err when it overruled Hilding's motion to sever the stalking charge from the sexual assault charges.

There Was Sufficient Evidence to Support Hilding's Convictions for Sexual Assault and Stalking.
Hilding asserts that there was insufficient evidence to support his convictions for stalking and for sexual assault. We conclude that the evidence was sufficient to support the convictions.
With regard to the stalking charge, Hilding was convicted of a violation of § 28-311.03, which provides that a person is guilty of stalking if he or she "willfully harasses another person or a family or household member of such person with the intent to injure, terrify, threaten, or intimidate." Hilding notes that many of the calls between himself and M.S. were initiated by M.S. and that some were made at the request of the police. He asserts that his statements were responses to allegations made by M.S. and were invited by the controlled calls initiated by the police.
The evidence in this case included evidence of numerous telephone calls initiated by Hilding to M.S. and of numerous e-mails Hilding sent to M.S. Most of these communications were initiated by Hilding rather than by M.S., and at least some of the communications by M.S. were responding to messages from Hilding. Furthermore, the stalking charge was supported by numerous statements Hilding made to M.S. in the telephone calls and e-mails, and such statements could rationally support a conviction regardless of which party initiated the communications. Hilding made numerous statements to the effect that he would tell people, including M.S.' family, friends, and coworkers, that M.S. had a sexually transmitted disease. He also made numerous threats of physical harm to M.S., to her brother, and to the men that M.S. dated. The jury reasonably could have found that Hilding's harassing communications were intended "to injure, terrify, threaten, or intimidate" M.S. and amounted to stalking. See § 28-311.03.
With regard to the sexual assault charges, Hilding was convicted of two violations of § 28-319, which provides that a person is guilty of first degree sexual assault if he or she "subjects another person to sexual penetration . . . without the consent of the victim." In Neb. Rev. Stat. § 28-318(8)(a) (Reissue 2008), "[w]ithout consent" is defined to mean, inter alia, that "[t]he victim was compelled to submit due to the use of force or threat of force or coercion, or . . . the victim expressed a lack of consent through words."
Hilding concedes that at trial, he admitted to sexual intercourse with M.S. on the days charged and states that the only issue at trial was whether M.S. consented. He also acknowledges that the issue is "largely one of witness credibility," but he argues that M.S.' testimony was "so conflicting and her conduct so implausible" that her testimony stating she did not consent is unbelievable and could not as a matter of law constitute proof beyond a reasonable doubt. Brief for appellant at 24-25.
The testimony of M.S., if believed by the jury, could establish that the sexual penetration was "without consent" as defined in § 28-318(8)(a). She testified that Hilding used force, the threat of force, or coercion to compel her to submit to sexual penetration and, additionally, that she expressed her lack of consent through words by telling him she did not want to have sex. Hilding's sole argument is that M.S.' testimony was not credible; however, the jury, as the fact finder, found her testimony to be credible. When reviewing a criminal conviction for sufficiency of the evidence, we, as an appellate court, do not pass on the credibility of witnesses, see State v. Branch, 277 Neb. 738, 764 N.W.2d 867 (2009), and because the jury as the trier of fact could have found the essential elements of first degree sexual assault beyond a reasonable doubt based on M.S.' testimony, the evidence was sufficient to support Hilding's two convictions for first degree sexual assault.
We conclude that the evidence was sufficient to support Hilding's convictions for stalking and two counts of first degree sexual assault.

The Facts of the Case Were Properly Examined to Determine Whether Hilding Committed Aggravated Offenses and Was Therefore Subject to Lifetime Registration and Lifetime Supervision.
Under Nebraska statutes, a defendant is subject to lifetime registration and lifetime supervision when he or she has committed certain "aggravated offenses." Hilding asserts that the district court erred when it found, "[u]nder the facts of this case," that he committed "aggravated offenses" as defined by § 29-4005(4) which resulted in the court's ordering that he be subject to lifetime registration pursuant to § 29-4005(2) and that he be subject to lifetime supervision pursuant to § 83-174.03(1)(c). As his sole argument in his brief on appeal, Hilding claims that it was improper to look at the facts of his case to determine that he committed aggravated offenses rather than looking solely to the statutory elements of the offenses of which he stands convicted. We find this assignment of error to be without merit.
Hilding notes that § 29-4005(4)(a) requires that to be an aggravated offense, an offense involving a victim age 12 years or older must involve the use of force or the threat of serious violence. Hilding argues that the finding based on the record that the sexual assaults in this case were "aggravated offenses" was erroneous, because under the first degree sexual assault statute, § 28-319, under which Hilding was convicted, the use of force or the threat of serious violence is not a necessary element. He argues that in making the determination of whether an offense is an aggravated offense, only statutory elements of the offense should be considered.
[11] We recently rejected the same argument in State v. Hamilton, 277 Neb. 593, 763 N.W.2d 731 (2009). In Hamilton, we held that
a sentencing judge need not consider only the elements of an offense in determining whether an aggravated offense as defined in § 29-4005(4)(a) has been committed. Instead, the court may make this determination based upon information contained in the record, including the factual basis for a plea-based conviction and information contained in the presentence report.
277 Neb. at 602, 763 N.W.2d at 738.
In the present case, it was determined from the record that the sexual assaults for which Hilding was convicted were aggravated offenses. Information contained in the record includes the evidence at trial, and the evidence in this case supported a finding that the sexual assaults involved the use of force or the threat of serious violence and were therefore aggravated offenses. See § 29-4005(4)(a). As noted above, in connection with sufficiency of the evidence, testimony by M.S. supported a finding that Hilding used force or the threat of serious violence to carry out the sexual assaults on M.S. Such information supports a finding that the offenses were aggravated offenses, thereby subjecting Hilding to lifetime registration and lifetime supervision. We therefore reject Hilding's argument that the determination of "aggravated offenses" is limited to an examination of the statutory elements.
At oral argument, for the first time, Hilding made additional arguments that were not briefed regarding the orders for lifetime supervision and lifetime registration. An appellate court always reserves the right to note plain error which was not complained of at trial or on appeal. State v. Robinson, 271 Neb. 698, 715 N.W.2d 531 (2006). However, we have examined the record, and we find no plain error with regard to such orders.

The Sentences Imposed by the District Court Were Not Excessive.
Finally, Hilding asserts that the district court imposed excessive sentences for all three convictions. We conclude that Hilding's sentences were not excessive.
We note first that Hilding's sentences were within statutory limits. Hilding was convicted of two counts of first degree sexual assault, which is a Class II felony pursuant to § 28-319(2), and one count of stalking, which is a Class I misdemeanor pursuant to Neb. Rev. Stat. § 28-311.04(1) (Reissue 2008). The court sentenced Hilding to imprisonment for 10 to 16 years on each of his convictions for first degree sexual assault, which sentences were within the limits for a Class II felony of imprisonment for a minimum of 1 year and a maximum of 50 years pursuant to Neb. Rev. Stat. § 28-105(1) (Reissue 2008). The court sentenced Hilding to imprisonment for 1 year on his conviction for stalking, which sentence was within the limits for a Class I misdemeanor of a maximum of imprisonment for 1 year pursuant to Neb. Rev. Stat. § 28-106 (Reissue 2008). The sentences were ordered to be served consecutively.
Hilding asserts that the sentences of imprisonment were an abuse of discretion, both in the length of the sentences and in the fact that he was sentenced to imprisonment rather than probation. He argues that the record does not establish that M.S. suffered or was threatened with serious physical or emotional harm. He also argues that he is unlikely to commit another crime and that he would likely respond affirmatively to probationary treatment.
Hilding points to nothing in the record of the sentencing which would indicate an improper basis for the sentences. Although the record does not indicate that M.S. suffered serious physical harm, the evidence indicates that Hilding used force and threats in perpetrating the sexual assaults. The record does not contain evidence to support Hilding's suggestion that M.S. did not suffer emotional harm. Further, Hilding's criminal history dating from 1992 refutes his assertion that he is unlikely to commit another crime and would respond well to probation. His criminal history included convictions for assault and third degree assault, three convictions for destroying property, two convictions for violating a protection order, two convictions for harassing telephone calls, and various convictions for traffic offenses. Hilding's criminal history also included various arrests on charges such as disturbing the peace, criminal mischief, and trespassing.
In light of the seriousness of the offenses in this case and Hilding's criminal history, we find no abuse of discretion in the sentencing. We reject Hilding's claim that his sentences were excessive.

CONCLUSION
Having rejected each of Hilding's assignments of error, we affirm his convictions and sentences for two counts of first degree sexual assault and one count of stalking.
AFFIRMED.
WRIGHT, J., participating on briefs.