IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. DERREZA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JORGE PEREZ DERREZA, APPELLANT.

Filed August 15, 2017.    No. A-16-527.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

Carlos A. Monzón of Monzón Law, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

INBODY, PIRTLE, and RIEDMANN, Judges.

INBODY, Judge.

### INTRODUCTION

Jorge Perez Derreza appeals his conviction for possession with intent to deliver methamphetamine of 140 grams or more, a Class IB felony, claiming there was insufficient evidence to support the jury's verdict. Derreza also claims the district court erroneously admitted hearsay evidence at trial, improperly instructed the jury, and inappropriately discharged a jury member.

### STATEMENT OF FACTS

#### EVIDENCE AT TRIAL

On September 5, 2014, Nebraska State Patrol Trooper Robert Pelster was in a marked patrol car on Interstate 80 outside of Lincoln, Nebraska, running stationary radar and observing eastbound traffic. Trooper Pelster was parked in the median and was patrolling an area of the

Interstate where the speed limit was 55 m.p.h., but within a half-mile would change to 65 m.p.h. While in this area, a white Chevy Impala caught Trooper Pelster's attention, and he determined the Impala was traveling 60 m.p.h. in the 55 m.p.h. zone. Trooper Pelster exited the median and caught up to the Impala to initiate a traffic stop in the 65 m.p.h. zone, clocking the Impala at 70 m.p.h.

When Trooper Pelster initiated his right turn signal to get into position to stop the Impala, a Chevy Tahoe came up beside Pelster's patrol car and prevented him from changing lanes. The Tahoe was following the Impala closely. As a result of the Tahoe driver's behavior, Trooper Pelster believed the Tahoe to be traveling with the Impala and that it was a decoy for the Impala, which caused Trooper Pelster to be immediately suspicious of criminal actions. Trooper Pelster called for backup after which State Patrol Sergeant Michael Grummert initiated a stop of the Tahoe for following too close and for an investigatory stop into why the Tahoe's driver was blocking Trooper Pelster from stopping the Impala.

While Sergeant Grummert conducted a stop of the Tahoe, Trooper Pelster initiated a traffic stop of the Impala. The Impala's sole occupant was the driver, Ronnie Menter. Menter provided Trooper Pelster his driver's license indicating he was from Marshalltown, Iowa, and the Impala's California registration indicating the Impala was a rental vehicle. Trooper Pelster noted the Impala was registered in Norwalk, California, which he knew to be a "source city" for methamphetamine and illicit drugs. Trooper Pelster asked Menter if he was traveling with another vehicle which Menter denied. Trooper Pelster then directed Menter to come with him to his patrol vehicle.

In the patrol vehicle, Trooper Pelster again asked Menter if he was traveling with anyone and Menter said he was not. After Trooper Pelster explained to Menter what he observed prior to the traffic stop, Menter told Trooper Pelster that he was traveling with a truck. Trooper Pelster also noted the Impala's rental contract was in Derreza's, not Menter's, name.

Sergeant Grummert contacted the two occupants of the Tahoe; the driver, Blake Thomas, and Derreza. Sergeant Grummert asked Thomas and Derreza if they were traveling with the Impala and both said they were not. The Tahoe was registered to Derreza's father. Sergeant Grummert spoke with Thomas and Derreza, seeking to compare their stories about their travels. While questioning Thomas, Sergeant Grummert believed Thomas to be evasive and untruthful. Derreza informed Sergeant Grummert that he and Blake were traveling to Marshalltown, Iowa, from California, after staying with Derreza's cousin for a week. Derreza initially told Sergeant Grummert that he and Blake were not traveling with anyone, but later changed his story and told Sergeant Grummert they were traveling with the Impala. After speaking with both Thomas and Derreza, Sergeant Grummert determined their stories did not match.

Sergeant Grummert and Trooper Pelster communicated regarding their stops and ultimately called for a drug detection dog to be brought to the scene. Nebraska State Patrol Sergeant Dane Hicks arrived with the drug detection dog and Sergeant Hicks deployed the dog around the Impala. The drug detection dog sat at the right rear corner of the Impala, which indicated an alert for drugs. Trooper Pelster searched the Impala's trunk, during which he lifted the mat covering the spare tire and noticed the screw that holds the spare tire in the well was missing. Trooper Pelster removed the tire and performed an "echo test" by creating a vibration on the tire to determine if it had contraband inside. Upon performing the test, Trooper Pelster

determined the tire was "loaded," cut open the tire, and found two bags of methamphetamine, which were later determined to have a combined weight of 1318.26 grams. Derreza, Thomas, and Menter were then arrested.

At the conclusion of the evidence, the case was submitted to the jury, which returned a guilty verdict. The trial court sentenced Derreza to 20 to 20 years' imprisonment with credit for 598 days' served.

COCONSPIRATOR STATEMENTS

At trial, the court allowed Trooper Pelster and Sergeant Grummert to testify about statements made by Thomas and Menter regarding their travel over Derreza's objections, determining that the statements were admissible based on the coconspirator exception to the hearsay rule. Specifically, the trial court determined the State made a prima facie case of the existence of a conspiracy between Thomas, Menter, and Derreza to distribute methamphetamine. The trial court determined there was "amply [sic] independent evidence . . . presented, other than any statements made by Menter or Thomas[,] to establish that prima facie case." The trial court determined the statements made by Thomas to Sergeant Grummert, and statements made by Menter to Trooper Pelster, were coconspirator statements made while the conspiracy was pending and in furtherance of its objects.

In response to the trial court's determination, Derreza asked for "further clarification on [the court's] finding as to what specific evidence the Court has . . . believed that the State has set forth in order to prove the elements of knowledge and agreement and furtive acts in furtherance of the conspiracy."

The trial court replied:

> Well, there were a number of things that prove the prima facie case. First of all, that the three individuals were traveling together. They traveled to California together. And . . . much of this, I will . . . concede, is circumstantial evidence, but it is circumstantial evidence that proves . . . by a preponderance of the evidence the conspiracy.
>
> Traveled together to California . . . they are traveling in two separate cars, one of which is a rental car that was rented in California and was rented by Mr. Derreza, but is being driven by Mr. Menter.
>
> . . . the travel is over the course, it would appear, of approximately a week. The rental car was rented on the tail end of that trip. Once . . . what I'll call the Nebraska behavior, the . . . rental car driven by Mr. Menter is observed to be speeding and a . . . traffic stop is attempted.
>
> That attempt is thwarted, initially, by the driving behavior of the Tahoe, driven by Mr. Thomas, where Mr. Derreza is the front-seat passenger. When the cars are stopped, Mr. Derreza denies travelling with the car that he had rented himself until confronted with that rental.
>
> When that car is ultimately searched, there is nearly three pounds of methamphetamine located in that car. All of that evidence, as well as the statements of Mr. Derreza about . . . the travel plans and the lack of involvements with the . . . Impala initially

lead the Court to the conclusion that there is a conspiracy, that he is acting in furtherance of that conspiracy.

And I make - I find those are the facts.

## JURY INSTRUCTIONS

At the completion of the evidence being presented to the jury, the trial court held a formal jury instruction conference. When reviewing Instruction No. 5, Derreza objected to "the possession part of the instruction" and requested to include an instruction that:

Possession of a controlled substance means knowing the nature and character of the controlled substance. And either knowingly have it - having it in one's person or knowing of its presence and having the right to exercise control or dominion over the controlled substance.

Following the request for the language to be used in the instructions, the trial court denied Derreza's proposal.

## JURY MEMBER J.M.

During a recess at trial, Sergeant Grummert and Trooper Pelster were sitting in the hallway when jury member J.M. made contact with them. Specifically, Sergeant Grummert stated J.M. said "his legs were getting tired" and that "he was sitting too long." Sergeant Grummert said he responded to J.M. by smiling and looking down. Trooper Pelster also stated J.M. made a statement to him about "walking and getting his exercise[]" and in response Trooper Pelster said "yeah" and looked down. Additionally, Trooper Pelster stated J.M. later approached him near the elevators asking if he could talk now, causing Trooper Pelster to respond "no, sir."

J.M. informed the court that during the recess, he said hello to the troopers involved in the case in the courtroom hallway and told them he gets "sick and tired of sitting down," "that [he] was making laps," and that "it's tough for [him]." J.M. also indicated he later asked Trooper Pelster if he was supposed to talk to him or not and Trooper Pelster told him "no."

Following testimony regarding the interactions between J.M., Trooper Pelster, and Sergeant Grummert, the State asked the trial court to discharge J.M. for failing to follow the court's admonitions. The State also stated its concern that J.M. might be prejudiced against the State if he remained on the jury because J.M. knew that the State brought J.M.'s violations to the trial court's attention. Derreza objected to the State's request. The trial court iterated its concern that J.M. ignored the trial court's instruction not to talk with lawyers, witnesses, or parties of the case and was "not following my instructions in the way that I have to be convinced a jury will follow these instructions." The trial court noted that it already had an alternate seated and ultimately determined to excuse J.M. from the jury. Following J.M.'s removal from the jury, Derreza moved for a mistrial, which the trial court overruled.

## ASSIGNMENTS OF ERROR

On appeal, Derreza's assignments of error, consolidated and restated, are that: (1) the evidence was insufficient to support the conviction; (2) the district court inappropriately allowed

the admittance of hearsay evidence at trial; (3) the district court improperly instructed the jury regarding possession; (4) the district court erred in dismissing a juror and replacing the juror with an alternate; and (5) the conviction should be reversed as a consequence of cumulative error.

## STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Draper*, 295 Neb. 88, 886 N.W.2d 266 (2016). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Draper, supra*.

Whether jury instructions are correct is a question of law. In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Hinrichsen*, 292 Neb. 611, 877 N.W.2d 211 (2016).

The retention or rejection of a juror is a matter of discretion for the trial court. This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009). Thus, the standard of review in a case involving a motion to dismiss a juror is whether the trial court abused its discretion. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998).

## ANALYSIS

### INSUFFICIENCY OF EVIDENCE

Derreza contends there was insufficient evidence to sustain his conviction for possession of methamphetamine because there was no evidence that he had contraband on his person. Additionally, Derreza claims the evidence was insufficient to show he knew there was methamphetamine in the rental car.

Neb. Rev. Stat. § 28-416(1) (Reissue 2016) states:

Except as authorized by the Uniform Controlled Substances Act, it shall be unlawful for any person knowingly or intentionally: (a) To manufacture, distribute, deliver, dispense, or

possess with intent to manufacture, distribute, deliver, or dispense a controlled substance; or (b) to create, distribute, or possess with intent to distribute a counterfeit controlled substance.

Additionally, Neb. Rev. Stat. § 28-416 (10) (Reissue 2016) provides:

Any person who violates subsection (1) of this section with respect to amphetamine, its salts, optical isomers, and salts of its isomers, or with respect to methamphetamine, its salts, optical isomers, and salts of its isomers, in a quantity of: (a) One hundred forty grams or more shall be guilty of a Class IB felony[.]

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 296 Neb. 494, 894 N.W.2d 303 (2017).

A person possesses a controlled substance when a defendant knows of the substance's nature, character, and presence and has dominion or control over it. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011). Such possession can be actual or constructive. *Id*. Mere presence at a place where a controlled substance is found is not sufficient to show constructive possession. *Id*. Constructive possession of an illegal substance can be shown by direct or circumstantial evidence. *Id*. Circumstantial evidence may also support a finding that a defendant intended to distribute, deliver, or dispense a controlled substance in the defendant's possession. *Id*. "Circumstantial evidence sufficient to establish possession of a controlled substance with intent to deliver may consist of evidence of the quantity of the substance, equipment and supplies found with the substance, the place where the substance was found, the manner of packaging, and the testimony of witnesses experienced and knowledgeable in the field." *Id*. at 369, 803 N.W.2d at 466. "Possession of a controlled substance can also be inferred if the vehicle's occupant acts oddly during the traffic stop, gives explanations that are inconsistent with the explanations of other vehicle occupants, or generally gives an implausible explanation for the travels." *Id*. at 370, 803 N.W.2d at 466-67.

Derreza was not in actual possession of the methamphetamine, so the question before us is whether there is sufficient evidence from which a trier of fact could reasonably infer he was in constructive possession. In other words, whether the trier of fact could reasonably infer he was aware of the methamphetamine's presence and had dominion or control over it. The evidence must show circumstances and facts affirmatively linking Derreza to the methamphetamine to suggest that he knew of its presence and exercised control over it. See *id*.

In this instance, the evidence proves Derreza, Menter, and Thomas were traveling together, in two separate cars. The record shows the Impala containing the methamphetamine was rented under Derreza's name and that the Tahoe in which Derreza was a passenger at the time of the stop was owned by Derreza's parents. The two vehicles were observed to be traveling together, as Trooper Pelster was hindered in stopping the speeding Impala by the Tahoe's actions. When questioned by Sergeant Grummert, Derreza stated he was traveling to Marshalltown, Iowa, from

California. Menter, the driver of the Impala, presented Trooper Pelster his driver's license indicating he was from Marshalltown, Iowa, the Impala's California registration, and the rental agreement with Derreza's information. Additionally, although Derreza initially told Sergeant Grummert that he and Blake were not traveling with anyone, he later told Sergeant Grummert that they were traveling with the Impala.

Viewed in the light most favorable to the State, the evidence supports a reasonable inference that Derreza knew of the methamphetamine and had constructive possession over it. Thus, there was sufficient evidence to support the jury's verdict and this assignment of error is without merit.

## HEARSAY EVIDENCE

Derreza argues the district court erred in admitting into evidence statements made by Menter and Thomas during the traffic stop under the coconspirator exception to the hearsay rule. The State contends that we need not decide whether the trial court validly applied the coconspirator exception to the hearsay rule because the statements made by Menter and Thomas during the traffic stop were not offered for the truth of the matter asserted. Brief of appellee at 19. We agree.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[.]" Neb. Rev. Stat § 27-801(3) (Reissue 2016). An out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted. *State v. Poe*, 292 Neb. 60, 870 N.W.2d 779 (2015). Statements offered to prove the falsity of the matters asserted are admissible as nonhearsay. See *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

In this instance, the statements made by Menter and Thomas, as testified to by Trooper Pelster and Sergeant Grummert, were not offered for their truth, but rather to prove the inconsistency of Menter, Thomas, and Derreza's stories. As such, the statements were not hearsay and the district court did not err in admitting the statements into evidence.

## JURY INSTRUCTIONS

Derreza also claims the district court erred in improperly instructing the jury and refusing to instruct the jury as to the element of constructive possession.

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*.

In this case, we are unable to analyze the jury instructions because the instructions given to the jury are not included as a part of our record. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Boche*, 294 Neb. 912, 885 N.W.2d 523 (2016). Absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *Id*.

Because Derreza failed to include in our record a copy of the instructions given to the jury, we affirm the decision of the district court as to the instructions given to the jury.

DISMISSING JURY MEMBER J.M.

Derreza further argues the district court erred in dismissing J.M. from the jury and that he was prejudiced as a result of the dismissal of J.M.

Neb. Rev. Stat. § 29-2004 (Reissue 2016) sets forth the procedure to replace a juror discharged during trial with an alternate juror. Specifically, § 29-2004 refers to the discharge of a juror already chosen as a juror. See *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009). Section 29-2004 does not specify the reasons a regular juror might be discharged, requiring replacement by an alternate juror. See *id*. Section 29-2004 only provides that if, before the final submission of the cause a regular juror dies or is discharged, the court shall order the alternate juror to take his or her place in the jury box. This was the procedure the district court followed in the present case when discharging J.M. and replacing him with the alternate juror.

In the instant case, J.M. spoke to the two responding law enforcement officers in the hallway during a recess. The trial court held a hearing with counsel, the law enforcement officers, and J.M. At the hearing, the trial court had the opportunity to hear the testimony of the law enforcement officers regarding their interaction with J.M. The trial court also had the opportunity to observe J.M., listen to J.M.'s version of the events, and responses to the questions. Based upon these observations, the trial court indicated its concern that J.M. ignored the court's instruction not to talk with witnesses and that J.M. failed to follow the instruction "in the way [the court has] to be convinced a jury will follow these instructions" and decided to dismiss the juror. We find no abuse of discretion and this assigned error is without merit.

CUMULATIVE ERROR

Derreza contends that as a result of all the errors taken together, he did not receive a fair trial and that if the case was tried without the errors, there is a substantial likelihood that he would have been acquitted.

The Nebraska Supreme Court has recognized the cumulative error doctrine in the context of a criminal jury trial, stating that "while one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect was to deprive the defendant of his constitutional right to a public trial by an impartial jury." *State v. Smith*, 286 Neb. 856, 893, 839 N.W.2d 333, 363 (2013) (internal quotations omitted). Given our resolution of Derreza's other assigned errors in this case, we find no error with regard to the cumulative error doctrine.

CONCLUSION

For the reasons stated above, we affirm Derreza's conviction and sentence.

AFFIRMED.