764 N.W.2d 867 (2009)
277 Neb. 738
STATE of Nebraska, appellee,
v.
James L. BRANCH, appellant.
No. S-08-781.
Supreme Court of Nebraska.
May 8, 2009.
*868 Mary C. Gryva, of Frank & Gryva, P.C., L.L.O., Omaha, for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ., and CARLSON, Judge.
WRIGHT, J.

NATURE OF CASE
James L. Branch was convicted by a jury of kidnapping and robbery. He was sentenced to a term of 40 to 50 years in *869 prison for the robbery conviction and to a term of life to life in prison for the kidnapping conviction. The sentences were ordered to be served concurrently. Branch appeals.

SCOPE OF REVIEW
[1,2] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Davis, 277 Neb. 161, 762 N.W.2d 287 (2009). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008).
[3] Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. State v. Albers, 276 Neb. 942, 758 N.W.2d 411 (2008).

FACTS
James Clark operated a vehicle storage facility and sold used cars in Omaha, Nebraska. On July 16, 2007, he was beaten, robbed, and placed in the trunk of one of the cars at his building. The perpetrators took Clark's wallet, which contained at least one credit card, and car titles.
Clark's wife became concerned upon receiving a telephone call from a credit card company notifying her of unusual activity on the card. She tried to call Clark several times, but he did not answer. She then called a family friend and asked her to check on Clark.
The friend went to the storage facility and found that the front door of the building was locked, even though a sign stating "YES We're OPEN" was hanging on the door. She entered through a door on the side of the building and walked through the three levels. She did not find Clark and called his wife. While on the telephone, the friend saw Clark's dentures on the floor. She hung up and called the 911 emergency dispatch service.
When Clark's wife arrived at the storage facility, she saw on the floor a plastic clip from a telephone that Clark carried with him at all times. Police officers arrived and directed Clark's wife and the friend to wait in the office. About 20 minutes later, they found Clark in the trunk of a car.
Clark was hospitalized and placed in a drug-induced coma for 18 days. He remained in the hospital for a total of 27 days. Clark underwent rehabilitation for an additional 10 days and then received home health care for 4 months. At the time of trial, he was using a walker for mobility.
Clark testified that on the morning of July 16, 2007, he was on the show floor of his building. He felt an arm placed around his neck from behind. Clark identified the person as an African-American male. The man pulled tightly around Clark's neck, causing him to have difficulty breathing. Almost immediately, a second African-American male struck Clark in the face with hard, closed-fist punches. Clark said he was initially held upright by the person whose arm was around his neck. After the last punch, he was lowered to the ground. A wire was placed around his neck, and he was dragged by his feet to a nearby automobile and placed in the trunk.
Clark said he was dazed and only vaguely remembered the incident, but he believed he was unconscious when placed in the trunk. He woke up shortly afterward *870 and tried to reach the key lock on the back side of the trunk lid, but he could not get to it because the area was carpeted. He also tried to use his glasses as a screwdriver to jimmy the lock, but the glasses broke. Clark believed he was in the trunk for about 6 hours, but after losing consciousness, the next thing he remembered was waking up in the hospital 3 weeks later.
Immediately prior to the assault, three African-American males entered the building, but Clark did not remember whether he had seen them before that date. He did not remember seeing them leave prior to the assault and could not identify the person who struck him in the face.
At Clark's building, police observed signs of a struggle and drag marks in the dust on the floor. The struggle appeared to have involved more than two people. There were several sets of footprints and some drag marks indicating that the people were pushing against each other. When the Omaha Fire Department arrived, they used a crowbar and other equipment to open the trunk where Clark was found. His hands had been tied, and there was a wire around his neck.
Later that evening, Omaha police responded to a call of suspicious activity at a convenience store. A cashier told police that customers had complained about two African-American males who were trying to get people to pay them cash for gas that the men would then purchase with a credit card. Receipts showed that at least $300 worth of gas had been charged to a credit card in Clark's name. The following day, police called the credit card company. Clark's card had been used between 4:45 and 10:45 p.m. on July 16, 2007, at four different locations.
A security officer at the convenience store testified that a customer complained to him about a man outside who was attempting to sell the use of a credit card to buy gas. The security officer saw an African-American male, about 5 feet 9 inches tall and weighing about 180 pounds, leaving the gas pumps. Before the security officer could talk to the man, he got into a white Chevrolet Corsica and left. Another African-American male was in the passenger seat. The security officer obtained the license number of the car. It was registered to Laquesha Martin, who lived in an apartment in Omaha. Police located the car at Martin's apartment. Martin was the mother of Branch's child and lived with Branch at the apartment.
About an hour after the police arrived at the convenience store, the store received at least three threatening telephone calls from someone who was upset because the police had been called. The caller threatened to "shoot up the store" and the vehicles of the cashier, the assistant manager, and the security guard.
Branch was subsequently arrested on outstanding misdemeanor warrants. Following his arrest, Branch admitted to police his involvement in the use of Clark's credit card. He said that Paul Miller had arrived at Martin's apartment with the card and that they used the card to fill cars with gas. Branch denied knowing where Miller obtained the card.
At trial, Branch admitted using Clark's credit card, but denied knowing anything about the robbery and assault of Clark. Branch claimed that on July 16, 2007, he slept until he went to pick up Martin at either 11 a.m. or 2 p.m. He was unable to recall the time because he had been to a party the night before. He and Martin went to a bank and then to a friend's house to feed Branch's dog, returning home at either 2:30 or 4:30 p.m.
Branch said Miller arrived with a credit card and asked him to drive Miller around to fill up some gas tanks. Branch claimed it was not unusual to see Miller with credit *871 cards because he had broken into lockers at a gym and stolen credit cards in the past. Branch understood that Miller would use the cards to fill a gas tank and then take cash from the driver.
At the first gas station, they used a credit card to fill up Martin's car. At a second gas station, they called friends and relatives to offer to fill their cars with gas. Branch said he used a credit card to fill up his brother-in-law's car, but Branch did not see a name on the card. Branch and Miller arrived at the convenience store around 4 p.m., and two of Branch's cousins came and had their gas tanks filled.
Branch said he and Miller were at the convenience store for about 2 hours and filled a number of tanks. They left when it appeared that the employees were getting suspicious. After leaving the convenience store, they went to Branch's mother's residence at about 6:15 or 6:30 p.m., stopped at the house of Miller's mother so he could change clothes, and arrived back at Martin's apartment at around 7:30 or 8 p.m.
Branch said it did not concern him that he was using a stolen credit card. When Branch saw the news report about the robbery, he did not connect it to the credit card he had been using all day. He also denied having been at Clark's business previously.
Miller pled guilty to robbery, false imprisonment, and assault in connection with the incident at Clark's business. At Branch's trial, Miller testified as a witness for the State. Miller explained the plan developed by Miller, Branch, and Michael Johnson. Branch and Miller went to Clark's business 6 days before the robbery to "scope it out." They talked to Clark and told him they wanted to store a car there. Branch said the car had big rims, and Clark asked if it could make a sharp turn around the ramp to an upper level. Clark showed them the ramp. They also asked the prices for several of the cars Clark had for sale.
The following Saturday, Branch and Miller discussed the plan for the robbery. Johnson was present and said he wanted to be included. The plan was to rob the business and take cars to sell. Miller was to be the lookout, and Johnson was to grab Clark while Branch hit him. They would use duct tape to restrain Clark's hands and legs and lay him on the floor of his office. They would each take a car and drive it around the corner and park it. They would return after dark to retrieve the cars and move them to another location. They would park the cars there until they could get titles in different names.
Miller testified that on July 16, 2007, Branch and Johnson picked up Miller in Martin's white Chevrolet Corsica. They arrived at Clark's business at around 11 or 11:15 a.m. Clark came out of his office and asked to help the three men, and Miller said they wanted to look at cars for sale. Clark started toward the back where cars were parked. When they got to the middle of the building, Johnson grabbed Clark and Branch hit him in the face. Miller left to sit in the car as a lookout. He was supposed to honk the horn if anyone came to the business. Branch came out about 10 or 15 minutes later and said he would give Miller extra money if Miller would drive the car inside the building.
As Miller drove into the building and up the ramp, he saw Clark's dentures on the floor. On the second floor, Miller saw Johnson with car speakers and an amplifier. Miller parked the Corsica and opened the trunk. He then looked at three other cars to see if there was anything valuable in them. He helped load the speakers and amplifier into the Corsica.
Branch, Miller, and Johnson drove to Johnson's house to drop off the speakers and amplifier. In the car, Miller was *872 handed 9 or 10 car titles, a wallet containing at least one credit card in Clark's name, and car keys with identifying tags. They returned to Branch's apartment and smoked marijuana for 30 or 45 minutes. They went to the gas stations and used a credit card to fill gas tanks in exchange for cash. They obtained about $70 at the first station, $120 at the second station, and about $15 at the third. They also accepted marijuana in place of cash.
At the convenience store, they used a credit card in Clark's name to fill every car present. When employees inside began watching them and the security guard came outside, Branch and Miller got back into the Corsica and Johnson walked off. Branch and Miller drove to the residence of Branch's mother. While there, Branch used the telephone in a back room, and Miller heard him yelling at the convenience store employees, telling them they should not have called the police. Miller said he did not know Clark had been placed in the trunk of a car until he saw the report on the news.
The jury found Branch guilty of robbery and kidnapping. He was sentenced to a term of 40 to 50 years in prison for the robbery and to a term of life to life in prison for the kidnapping, to be served concurrently. Branch appeals.

ASSIGNMENTS OF ERROR
Branch assigns three errors: (1) The district court erred in overruling Branch's motion to dismiss and allowing the case to go to the jury, (2) the evidence was insufficient to sustain guilty verdicts for kidnapping and robbery, and (3) the sentence for robbery was excessive.

ANALYSIS

MOTION TO DISMISS AND SUBMISSION OF CASE TO JURY
[4] A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution, and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict, but may challenge sufficiency of the evidence for the defendant's conviction. State v. Sanders, 269 Neb. 895, 697 N.W.2d 657 (2005).
At the close of the State's evidence, Branch moved to dismiss, arguing that the evidence did not sustain a prima facie case to go forward. The court overruled the motion, and Branch proceeded to present evidence. Thus, he has waived the right to challenge the court's ruling on the motion to dismiss.

SUFFICIENCY OF EVIDENCE
[5] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Davis, 277 Neb. 161, 762 N.W.2d 287 (2009). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008).
The evidence in this case is a combination of direct and circumstantial. Miller testified that Branch was involved in the planning and execution of the crime. Miller said he and Branch went to Clark's business 6 days prior to the robbery to "scope it out." On the day of the robbery, Miller saw Branch hit Clark in the face. Miller was handed Clark's wallet and went *873 with Branch to several gas stations to use the credit card in Clark's name.
Miller testified that the original plan was to steal cars, but ultimately, they took personal property belonging to Clark and car titles. On cross-examination, Miller admitted that he had not given consistent statements about the incident. However, Miller identified Branch as a participant in the crimes. The physical evidence showed that Clark was bound with duct tape and placed in a locked car trunk.
Branch testified in his own behalf and admitted his involvement in the use of a credit card taken from Clark during the robbery. However, his recollection of the events of July 16, 2007, was sketchy. Branch could not state whether he picked up Martin at 11 a.m. or 2 p.m. He stated that he did not know whether they returned home at 2:30 or 4:30 p.m., but then he said he and Miller left the apartment around 2 or 3 p.m. He said they arrived at the convenience store around 4 p.m. and were there for 2 hours.
Branch admitted that he used a credit card to purchase gas for others, but he claimed he never looked at the card or saw Clark's name on it. It did not concern Branch that he was using a stolen credit card, and he claimed that he did not connect the credit card to the robbery when he heard about it on the news.
Branch testified that he was about 5 feet 9 or 10 inches tall and weighed about 145 or 150 pounds at the time of the robbery. The security guard at the convenience store testified that one of the African-American males he saw drive away in the Corsica was about 5 feet 9 inches tall and weighed about 180 pounds. Miller testified that he was 6 feet tall and weighed about 235 pounds.
[6-8] Any conflicts in the evidence or questions concerning the credibility of witnesses are for the finder of fact to resolve. See State v. Schreiner, 276 Neb. 393, 754 N.W.2d 742 (2008). An appellate court does not reweigh the evidence in reviewing a criminal conviction. Id. A conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. Id.
Clark was grabbed from behind and beaten. He was bound and placed in a locked car trunk. Clark testified he was in the trunk for hours. He sustained serious injuries which required that he be placed in a drug-induced coma for nearly 3 weeks.
Neb.Rev.Stat. § 28-313 (Reissue 2008) defines kidnapping: "A person commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to ... [t]errorize him or... [c]ommit a felony." Robbery occurs when a person, with the intent to steal, "forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." Neb.Rev.Stat. § 28-324 (Reissue 2008). Clark was beaten and abducted so that the perpetrators could steal from his business. The evidence supports the fact that the crimes of kidnapping and robbery were committed.
[9, 10] On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. State v. Kuhl, 276 Neb. 497, 755 N.W.2d 389 (2008). From the evidence presented, the jury found beyond a reasonable doubt that Branch committed the crimes of kidnapping and robbery. Viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the *874 essential elements of the crimes beyond a reasonable doubt.

EXCESSIVE SENTENCE
[11] Branch also claims that the sentence for robbery was excessive. Robbery is a Class II felony and is punishable by a sentence of 1 to 50 years in prison. § 28-324; Neb.Rev.Stat. § 28-105 (Reissue 2008). Branch was sentenced to a term of 40 to 50 years in prison. He argues that the sentence given for the robbery was excessive, because the court also considered the violent nature of the kidnapping in imposing the sentence. Because kidnapping requires a mandatory life sentence, Branch claims that violence had already been factored into the sentence and that, therefore, the term imposed for robbery was excessive.
Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. State v. Albers, 276 Neb. 942, 758 N.W.2d 411 (2008). Although Branch had no prior criminal history, Clark was abducted, violently assaulted, and incurred great pain and suffering. The district court did not abuse its discretion in imposing the sentence.

CONCLUSION
The evidence is sufficient to support the verdicts. The sentence for robbery was not an abuse of discretion. The judgment of conviction is affirmed, and the sentences are affirmed.
AFFIRMED.
MILLER-LERMAN, J., not participating.