775 N.W.2d 429 (2009)
279 Neb. 6
STATE of Nebraska, appellee,
v.
Marcus L. HUDSON, appellant.
No. S-09-130.
Supreme Court of Nebraska.
December 11, 2009.
*431 Thomas C. Riley, Douglas County Public Defender, and Scott C. Sladek for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and SIEVERS, Judge.
*432 WRIGHT, J.

I. NATURE OF CASE
Marcus L. Hudson was convicted by a jury of first degree murder, use of a firearm to commit a felony, and possession of a firearm by a felon. Hudson appeals, claiming that the evidence was insufficient and that the trial court erred in allowing testimony as a hearsay exception pursuant to Neb.Rev.Stat. § 27-801(4)(b) (Reissue 2008).

II. SCOPE OF REVIEW
When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Branch, 277 Neb. 738, 764 N.W.2d 867 (2009). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Id. Any conflicts in the evidence or questions concerning the credibility of witnesses are for the finder of fact to resolve. Id. A conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. Id.
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. State v. Edwards, 278 Neb. 55, 767 N.W.2d 784 (2009).

III. FACTS
On May 24, 2005, Verron Jones was talking to a friend in the driveway of a house on Fontenelle Boulevard in Omaha, Nebraska. Gunshots were fired, and Jones was hit by one of the gunshots. He died as a result.
A few days before the shooting, Will McDonald agreed to buy 2 ounces of cocaine for Hudson. McDonald was given $1,950 by Hudson to purchase the cocaine from McDonald's uncle, Anthony Nokia. McDonald added $300 of his own money to buy another one-half ounce of cocaine, which he planned to resell.
At Nokia's house, McDonald laid the money on a bed. Two men unknown to McDonald came in and handed McDonald a bag that looked like it contained "a bunch of eight balls." McDonald and Nokia wanted to check the quality of the cocaine. Nokia loaded his pipe with part of the drugs, but the pipe would not "fir[e]." As McDonald turned to inquire about the drugs, one of the men showed a gun and told McDonald they were taking the money. The men ran outside and left in a Chevrolet Blazer.
Nokia told McDonald one of the men was Jones. McDonald retrieved his 9-mm handgun. He then met Hudson and told him about the robbery. Hudson was furious. McDonald told Hudson that Jones was one of the men. McDonald obtained Jones' telephone number and gave it to Hudson. McDonald heard Hudson call the number and tell the person who answered to return the money. McDonald also gave Hudson the telephone number of Jones' stepfather, Nathaniel Long.
Hudson and McDonald went to Long's home. Long had previously purchased crack cocaine from Hudson. Hudson told Long that Jones had robbed him of $2,500. Hudson pulled a gun from under his shirt *433 and asked Long the whereabouts of Jones. Long called Jones, and Hudson grabbed the telephone. Hudson said, "[W]hen I see your [expletive] ass, I'm going to kill your [expletive] ass." Long offered to get Hudson the money in a couple of days.
Hudson told Long he would kill Jones as soon as he saw him rather than wait for the money. Hudson also threatened to kill Long and everyone who lived in Long's house. As Hudson and McDonald started to leave, Hudson pulled out his gun and told Long to tell Jones that Hudson had "50 shots for him."
Hudson and McDonald spent several evenings looking for Jones. Meanwhile, Hudson told Robert Sessions that Jones had robbed McDonald of $2,000 of Hudson's money. At about 1 a.m. on May 24, 2005, Hudson called Sessions and told him that Hudson had found Jones. Hudson, McDonald, and Sessions got into a car, with McDonald driving. All three had guns. McDonald saw Jones and pointed him out. Jones was talking to a woman while standing next to a car parked in a driveway. Hudson told McDonald to stop about a half block away. Hudson and Sessions got out and walked toward the house. When they were about two houses away, Sessions heard Hudson put the clip in his gun and a bullet in the chamber. Hudson then pushed Sessions out of the way and started shooting. Hudson fired between 10 and 20 shots. Sessions ran away and did not look back.
After Hudson and Sessions got out of the car, McDonald drove down the street and parked in a driveway. He heard shots fired, and when they stopped, he drove slowly back down the street. He heard his name and saw Hudson come out of the bushes and get in the back of the car. Hudson said he did not know where Sessions was and told McDonald to "[g]et out of here." Hudson told McDonald, "I shot [Jones] out his shoes." Hudson and McDonald returned to the house where they had met earlier. Sessions returned later.
Police found Jones on the ground across the street from the driveway. The first police officer to respond reported that Jones was nonresponsive and that his breathing was shallow. The officer saw no visible injury, but noticed that Jones' shoes were missing. A shoe was found in the street about 10 to 15 feet away. Jones died later at a hospital.
McDonald testified that on June 21, 2005, he was driving a car with his cousin Shenika Johnson and Sessions. They were stopped by police for having fictitious license plates. There was a gun in the glove box, so when the officer asked for insurance papers, McDonald sped off. A high-speed chase followed, during which Sessions threw the gun out of the car. The car crashed into a fence, and McDonald and Sessions got out and ran away. Johnson was taken to police headquarters.
McDonald was later arrested. He agreed to testify against Hudson in exchange for the dismissal of use of a weapon, terroristic threats, and habitual criminal charges. He was convicted of being a felon in possession of a weapon. Sessions was also eventually arrested and agreed to testify.
Over Hudson's objections, Johnson testified to telephone conversations she heard between Hudson and McDonald. Her testimony is further detailed later in this opinion.
Crime scene technicians testified that they examined 12 spent casings from a 9-mm weapon. The casings were found in the same driveway where Jones was discovered. There was also an unfired 9-mm round on the sidewalk nearby. The coroner testified that Jones died from a single gunshot wound to the chest that perforated *434 the left lung and caused bleeding into the chest cavity.
Hudson was convicted and sentenced to life in prison for the murder conviction, 10 to 20 years in prison for the use of a firearm conviction, and 5 to 10 years in prison for possession of a firearm. He was given credit for 609 days served, to be credited against the use of a firearm conviction. All sentences are to be served consecutively.

IV. ASSIGNMENTS OF ERROR
Hudson assigns two errors: (1) The trial court erred in allowing hearsay testimony from Johnson under an exception to the hearsay rule for statements made by a coconspirator pursuant to § 27-801(4)(b), and (2) there was insufficient evidence to support the convictions.

V. ISSUES PRESENTED

1. COCONSPIRATOR EXCEPTION TO HEARSAY
Hudson argues that the trial court committed reversible error when it allowed the State to offer testimony by Johnson under the coconspirator exception to the hearsay rule, § 27-801(4)(b). "`[B]efore the trier of facts may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence.. . .'" State v. Gutierrez, 272 Neb. 995, 1018, 726 N.W.2d 542, 565 (2007), quoting State v. Bobo, 198 Neb. 551, 253 N.W.2d 857 (1977). The question is whether the State established the existence of a conspiracy between Hudson and McDonald that would permit the admission of Johnson's testimony regarding a conversation between Hudson and McDonald that Johnson overheard. We examine the evidence presented prior to the time Johnson's statements were admitted.

(a) Evidence Presented at Trial

(i) Sessions' Testimony
Sessions, who had met Hudson and McDonald in prison, testified prior to Johnson. Sessions testified that Hudson told him that McDonald had set up a deal to buy drugs from Jones using Hudson's money. McDonald was robbed of $2,000 of Hudson's money. Sessions said that Jones and another person robbed McDonald at gunpoint. Hudson told Sessions that he was going to beat up Jones because Hudson wanted his money back.
Sessions stated that on May 24, 2005, Hudson called and said that he and McDonald had found Jones. Hudson told Sessions to come to a house on Larimore Avenue. When Sessions got to the house, Hudson and McDonald were sitting on the front porch, drinking a bottle of gin. The three got into a car, and McDonald drove. All three had weapons: Sessions had a.22-caliber semiautomatic pistol, Hudson had a "TEC-9" with a 50-round clip, and McDonald had a 9-mm handgun.
Sessions testified that McDonald pointed to a man on the street and identified him as Jones. Hudson told McDonald to stop the car about half a block away, and McDonald pulled into a driveway. Hudson and Sessions got out of the car and approached the house. They had their weapons with them. Sessions saw Jones standing next to his car with a female. Hudson got behind Sessions and told him to keep walking. Sessions heard Hudson put the clip in his gun and a bullet in the chamber. When they were about one driveway from Jones, Hudson pushed Sessions out of the way and started shooting at Jones.
Sessions said he had his weapon in his hand, but he froze and did not fire any shots. As soon as the first shots were fired, Sessions saw Jones let go of the *435 woman, spin around, and try to run. He lost a shoe as soon as he hit the driveway. Hudson walked up to Jones and "was shooting at him the whole time." Sessions believed Hudson fired between 10 and 20 shots. Sessions ran away, and when he returned to the house on Larimore Avenue, Hudson and McDonald were on the porch. Sessions then got into his car and went home.
In a few days, Sessions went to the house where Hudson was staying. Hudson, McDonald, and Sessions talked about the shooting. Hudson had the TEC-9 handgun on a stool. He said he had cleaned it with bleach and was going to get rid of it. He told McDonald and Sessions that if they talked to anyone about the shooting, he would kill them, and that if he was in jail, he would find someone to kill them.
Sessions said Hudson continued to call him every day. Sessions stated that within a month of the shooting, Hudson told him that Hudson and McDonald had previously gone to Jones' house and threatened Jones' stepfather with a gun. According to Sessions, Hudson had talked to Jones on the telephone and "they were threatening each other."
Sessions was arrested for drug trafficking in Nevada in May 2006. He first talked to Omaha police in September 2006 after the prosecutor's office agreed that he would not face any charges based on his statement. The prosecuting attorney in Nevada was told that Sessions was cooperating. All of Sessions' testimony was received without objection before Johnson testified.

(ii) Johnson's Testimony
Johnson testified to a conversation she overheard between Hudson and McDonald regarding a drug deal. Hudson argues it was reversible error to allow the testimony.
Johnson stated that she was aware McDonald was involved in buying drugs, but she claimed she did not know at the time that McDonald had a weapon. When Johnson began to testify about the drug deal, Hudson objected on the basis of hearsay. The State argued that it had established a prima facie case through Sessions that Hudson and McDonald had purchased drugs and that Johnson's statements would be in furtherance of the conspiracy. The trial court sustained the objection. Johnson then testified that she had become aware that McDonald was looking to "`re-up,'" which meant to buy drugs to resell. Johnson said McDonald told her where he obtained the money to buy the drugs and where he was going to buy more drugs.
Johnson testified that she heard McDonald on the telephone with Hudson. She was asked what she heard McDonald say. Hudson's hearsay objection was overruled, and he was granted a continuing objection. Johnson testified she heard McDonald say that he was going to get Hudson's money and put it with McDonald's money to buy more drugs. Johnson said McDonald left to get the money from Hudson and then came back and got her. She rode with McDonald to "Tony's" (Nokia's) house to purchase the drugs. Johnson thought Nokia had set up the transaction.
At Nokia's house, Johnson stayed in the living room on the first floor and Nokia and McDonald went upstairs. At some point, two men arrived and went upstairs. After some time had passed, the two men came down and left quickly. McDonald and Nokia came down 5 or 10 minutes later. Johnson could see that McDonald was angry. She and McDonald left. Johnson drove while McDonald made a telephone call to Hudson. Johnson heard *436 McDonald tell Hudson he had been "jacked" or robbed of Hudson's money. McDonald and Johnson drove back to the house where McDonald was staying.
On the day of the shooting, Johnson went with McDonald to a house on Larimore Avenue so McDonald could talk to Hudson. Less than an hour after they arrived, Hudson and McDonald left. Johnson stayed to watch television, but later fell asleep. She woke up when Hudson "bust[ed] through the back door," went to the sink, and vomited. Johnson heard Hudson say that "he got that boy. He made him run up out his shoes." Johnson also saw Sessions at the house that night. Johnson did not ask McDonald any questions because she did not want to know what had happened. She saw on the news the next day that Jones had been murdered.
Johnson later learned that McDonald had been charged with terroristic threats. She did not visit him in jail, but she talked to him on the telephone. He told her to go to the police and tell the truth.

(b) Analysis
We find no merit to Hudson's argument that Johnson's testimony should not have been allowed as an exception to the hearsay rule under § 27-801(4)(b)(v). The rule provides that a statement is not hearsay if it is "`offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.'" See State v. Hansen, 252 Neb. 489, 498, 562 N.W.2d 840, 848 (1997). "To be admissible, the statements of the coconspirator must have been made while the conspiracy was pending and in furtherance of its objects." Id. "The coconspirator exception to the hearsay rule is applicable regardless of whether a conspiracy has been charged in the information or not." Id.
In this case, Hudson and McDonald conspired to purchase illegal drugs for resale. In the course of that transaction, their money was stolen. They conspired to get their money back, and that plan resulted in Jones' being shot. Johnson testified to conversations she heard between Hudson and McDonald related to their plan to purchase drugs. The conspiracy was pending at the time and in furtherance of its objectives. Johnson testified that she heard McDonald on the telephone with Hudson and that McDonald said he was going to get Hudson's money and put it with his to buy more drugs.
Sessions' testimony was offered at trial prior to Johnson's testimony. Sessions testified that McDonald had used Hudson's money to buy drugs and that the money had been taken by Jones. Sessions had been told by Hudson that McDonald arranged the drug transaction that resulted in the robbery. Hudson stated he planned to beat up Jones to get his money back. Sessions was with Hudson on the night of the murder and testified to the events surrounding it. Thus, Sessions' testimony established the conspiracy to purchase drugs using Hudson's money and Hudson's plans to get his money back from Jones.
The purpose of requiring independent evidence to establish a conspiracy is "`to prevent the danger of hearsay evidence being lifted by its own bootstraps, i.e., relying on the hearsay statements to establish the conspiracy, and then using the conspiracy to permit the introduction of what would otherwise be hearsay testimony in evidence.'" State v. Gutierrez, 272 Neb. 995, 1018, 726 N.W.2d 542, 565 (2007), quoting State v. Bobo, 198 Neb. 551, 253 N.W.2d 857 (1977). In this case, Sessions' testimony established the conspiracy before Johnson's hearsay testimony was offered.
*437 Hudson argues that Johnson's testimony was inadmissible because Sessions did not testify the drugs were for Hudson. We disagree. Prior to Johnson's testimony about the conversations she heard between Hudson and McDonald, she stated she was aware McDonald was involved in buying drugs and that he planned to "`re-up,'" that is, to use money to buy more drugs and resell them. Sessions testified that McDonald used Hudson's money to buy the drugs and that McDonald was robbed. It is reasonable to infer that Hudson furnished the money to buy the drugs and that McDonald was part of this conspiracy. At the time Johnson's statements were admitted, evidence had been received establishing the conspiracy between Hudson and McDonald to purchase drugs. Johnson then testified about statements made by McDonald to Hudson.
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. State v. Edwards, 278 Neb. 55, 767 N.W.2d 784 (2009). Sessions' testimony provided prima facie evidence of an agreement between Hudson and McDonald to purchase drugs. Johnson had personal knowledge of that agreement. The agreement led to the botched drug deal, which in turn led to the shooting of Jones. The statements made by McDonald that were overheard by Johnson were admissible as those of a coconspirator, and the trial court did not abuse its discretion in overruling Hudson's objection to them.
If there was any error in the admission of Johnson's testimony, it was harmless. In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error. State v. Poe, 276 Neb. 258, 754 N.W.2d 393 (2008), cert. denied ___ U.S. ___, 129 S.Ct. 914, 173 L.Ed.2d 127 (2009). The evidence described above established that the verdict was surely unattributable to the admission of Johnson's testimony. Even if McDonald's statements had not been admitted through Johnson's testimony, the jury would have reached the same verdict of guilty.

2. SUFFICIENCY OF EVIDENCE
Following Johnson's testimony, the coroner testified that Jones died from a single gunshot wound to the chest, which perforated his lung and caused bleeding into the chest cavity. Other witnesses testified about cellular telephone records and physical evidence. Jones' stepfather testified as to the threats made by Hudson. McDonald testified about the drug deal, the events of the night of the murder, and the visit to Jones' stepfather's home. Hudson did not testify or offer any evidence.
Hudson and McDonald believed that Jones was one of the people who took their money during a drug transaction. Hudson threatened Jones' stepfather and his family and stated that he wanted to hurt Jones. Hudson, McDonald, and Sessions drove around looking for Jones. When Jones was sighted outside a house on Fontenelle Boulevard, Hudson told McDonald to stop the car. Hudson and Sessions, who were both armed, walked toward the driveway of the house where Jones was standing with a woman. Sessions heard Hudson load his gun. Hudson pushed Sessions out of the way and began shooting at Jones. Hudson told both McDonald *438 and Sessions that he had shot Jones.
Hudson argues that the testimony of McDonald and Sessions lacked credibility because they were both felons. Sessions met Hudson while incarcerated, and McDonald met Hudson through men he had met in prison. Both made agreements with the State that resulted in lesser charges against them. The jury heard and observed the witnesses and returned a verdict of guilty.
When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Branch, 277 Neb. 738, 764 N.W.2d 867 (2009). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Id. Any conflicts in the evidence or questions concerning the credibility of witnesses are for the finder of fact to resolve. Id. The evidence, viewed and construed most favorably to the State, is sufficient to support the convictions.

VI. CONCLUSION
There was no error in the admission of Johnson's testimony. The evidence was sufficient to support the convictions. The judgment of the district court is affirmed.
AFFIRMED.
HEAVICAN, C.J., not participating.