Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/28/2016 09:09 AM CDT

State of Nebraska, appellee, v.
Peter Francis Draper, appellant.
___ N.W.2d ___

Filed October 28, 2016.    No. S-15-1222.

1. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

4. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

5. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

6. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, an appellate court does not pass on the credibility of witnesses—that is for the trier of fact.

7. ____: ____. In reviewing a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

8. **Convictions: Witnesses.** A defendant's conviction of a crime may be based on uncorroborated testimony of a single witness.

9. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

10. **Trial: Evidence: Appeal and Error.** Generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

11. **Sentences: Appeal and Error.** In reviewing a sentence imposed within the statutory limits, an appellate court considers whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

12. **Sentences.** When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

13. ____. Traditionally, a sentencing court is accorded very wide discretion in determining an appropriate sentence.

Appeal from the District Court for Franklin County: Stephen R. Illingworth, Judge. Affirmed.

Charles D. Brewster, of Anderson, Klein, Brewster & Brandt, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Cassel, J.

## I. INTRODUCTION

In this direct appeal, Peter Francis Draper challenges his convictions for intentional child abuse resulting in death and

intentional child abuse resulting in serious bodily injury. He alleges that there was insufficient evidence to support either conviction, that improper opinion and rule 404[1] testimony was allowed into evidence, and that he received excessive sentences. Finding no merit in his arguments, we affirm.

## II. BACKGROUND

Draper was convicted of intentional child abuse resulting in death and intentional child abuse resulting in serious bodily injury in connection with the untimely death of his 2-year-old grandson. For the second time, Draper has appealed these convictions to this court. On the first direct appeal, after finding cumulative error concerning the testimony of Draper's wife, Nancy Draper (Nancy), we reversed Draper's convictions and remanded the cause for a new trial.[2] The case is now before us on direct appeal from the second trial. We briefly summarize those proceedings.

### 1. Joe Jr.'s Injuries and Death

Joseph Rinehart, Jr. (Joe Jr.), died on April 30, 2012. He was 2 years old. At the time of his death, Joe Jr. lived with his mother, Laura Rinehart (Rinehart), his maternal grandparents, Draper and Nancy, and his three siblings in a small three-bedroom trailer home. Joe Jr.'s father was separated from Rinehart and had not had contact with Joe Jr. or any of the Rinehart children for the year leading up to Joe Jr.'s death. At all times when Joe Jr. would have sustained his injuries, the only adults to have unchecked access to him were Rinehart, Draper, and Nancy.

On April 30, 2012, at approximately 6 p.m., Joe Jr. was brought to the community hospital by Rinehart and Nancy after Rinehart noticed red in his vomit. He had shown flu-like symptoms—lethargy, diarrhea, and vomiting—for the last

---

[1] Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014).

[2] *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015).

several days. At the hospital, the physician on call performed an examination and concluded that the child had a swollen stomach. The physician then ordered an x ray of his abdomen to determine the cause of the swelling. The x ray showed no signs of injuries but did show possible signs of constipation. At that point, the physician treated Joe Jr. for constipation and sent him home.

Approximately 1 hour after Joe Jr. was discharged from the hospital, Rinehart and Nancy brought him back to the emergency room. He was not breathing and had no heartbeat. The hospital staff attempted to revive him for 45 minutes but were never able to find a heartbeat. The treating physician declared Joe Jr.'s time of death at approximately 8:41 p.m.

Because the cause of death was unexplained, the hospital staff notified law enforcement of Joe Jr.'s death. Law enforcement officials then initiated a death investigation for the purpose of collecting information to determine the cause of death.

Law enforcement officials interviewed Rinehart, Draper, and Nancy late in the evening on April 30, 2012. At no point did Rinehart or Draper mention concerns of abuse. Draper did tell the interviewing officer that he believed the autopsy would show no signs of violence but may show signs of a rare "bone disease."

An autopsy was performed on Joe Jr., and the pathologist concluded that the cause of death was multiple blunt force trauma of the head, trunk, and extremities. The manner of death was ruled to be homicide. Post mortem CT scans showed old rib fractures, a recent skull fracture, a recent pelvic fracture, strain injuries on the arms and shoulders, and a ruptured bowel. The perforated bowel was likely associated with the recent pelvic fracture.

Medical experts determined that these injuries were likely the result of abuse or outer trauma, because Joe Jr. did not have any bone disease or other contributing disability. The pathologist who performed the autopsy additionally identified

several bruises on the child's knees, elbows, shoulders, and thighs and dated several of them as less than 24 hours old.

## 2. ARREST AND CHARGES

After the autopsy, law enforcement officials interviewed Rinehart, Draper, and Nancy again and ultimately arrested all three. The lead investigator noted probable cause arose "based on the amount of injury on [Joe Jr.], [and] given the small size of the residence, . . . it was [not] reasonable that there could be that amount of injury to a small child and any of the adults wouldn't have some knowledge that that was occurring." Once detained, Rinehart shared her belief that Draper had abused Joe Jr. She then entered a plea agreement with the State for a reduced charge in exchange for testifying against Draper at trial. Based on this information, Draper was subsequently charged with child abuse resulting in death, allegedly committed on or between April 23 and 30, 2012, as well as child abuse resulting in serious bodily injury on or between July 12, 2011, and April 22, 2012.

## 3. TRIAL EVIDENCE

At trial, the State presented testimony of several health professionals to describe Joe Jr.'s various injuries and the possible sources of the injuries. None of the professionals were able to point to a particular individual who committed the abuse. Rinehart was the only witness to specifically testify to Draper's alleged physical abuse of Joe Jr. and to explain the events leading up to his death. Several other witnesses also testified to their interactions with Draper to confirm his control of the household and substantiate Rinehart's claims. Draper did not testify in his behalf or present any witnesses of his own.

### (a) Rinehart's Testimony

Rinehart testified that after her husband left the home, Draper became the primary disciplinarian of her children. His disciplinary techniques supposedly included timeouts that

could last from "a couple minutes to a couple hours to a couple of days." Rinehart's other children, aged 4 to 8 at the time of the trial, would be "disciplined" for crying and would be made to stand in a corner and sometimes would have to lift weights over their heads.

According to Rinehart, Draper generally handled Joe Jr. roughly—dragging him or yanking him by the arm. She also described specific instances of physical abuse of Joe Jr. by Draper. She testified that Draper once pushed Joe Jr. down repeatedly so that his head hit the floor until the child's head was swollen and his eyes were black and blue. On that occasion, Rinehart was not allowed to take Joe Jr. to the hospital, because Draper warned her that Child Protective Services would get involved.

Rinehart recalled one specific instance of abuse that she believed caused the injuries resulting in Joe Jr.'s death. She testified to have had witnessed Draper kneel on Joe Jr.'s abdomen with Joe Jr. on his back on the bed in the back bedroom. At the same time, Draper held Joe Jr.'s arms above his head and pressed one hand down on the child's chest. Apparently, Draper was attempting to get the child to say "'yes, sir,'" and held the child down in this position for several minutes while exerting more pressure with his hand or knee when the child did not immediately say what he wanted. Rinehart testified that it was within a couple days of this incident that Joe Jr. started to get sick and began to vomit a brown liquid.

After Rinehart described this incident she witnessed in the back bedroom, the State questioned her about the cause of a bruise above Joe Jr.'s ear that was discovered during the autopsy:

Q (By [the State]) Exhibit 104, there's an injury above [Joe Jr.'s] ear. Do you see that?

A Yes, ma'am.

Q Do you know how that occurred?

A I believe that happened on one of the bars that was on the bed. The railings.

Q Are you speculating or do you know? Did you see
it happen?

A No, I didn't.

Draper timely objected to Rinehart's response as mere specu-
lation. However, the court overruled this objection, noting
that "she didn't testify your client did it. She said she thought
it happened on the bed. . . . If she said [Draper] did something
to cause it on the bed, then we — I'd reconsider your objec-
tion. But she didn't say that."

On cross-examination, Draper questioned Rinehart about
missed opportunities to report the abuse of Joe Jr. earlier and
her plea agreement. Rinehart admitted that she did not ini-
tially speak about Draper's abuse of Joe Jr. until after she was
arrested and faced with a Class IB felony charge. Rinehart
claimed that she was afraid of what Draper would do if she
told anyone about the abuse and that she felt safer talking
about it once he was arrested.

### (b) Rule 404 Evidence

The State's case heavily relied upon Rinehart's testimony,
because she was the only one to tie Draper to the cause of
Joe Jr.'s death. To corroborate Rinehart's fear of Draper, the
State elicited testimony from two child development social
workers and one Children and Family Services (CFS) initial
assessment worker who had negative encounters with Draper
when visiting the Draper residence.

### (i) Child Development Social
### Workers' Testimony

Prosecution sought to elicit testimony from two child devel-
opment social workers who had testified in the first case
concerning the signs of child abuse they had witnessed at the
Draper residence and their confrontation with Draper during
an unscheduled child welfare checkup. Before either witness
was called to the stand, however, Draper objected to their tes-
timony as improper character evidence. The court considered

this objection as a motion in limine outside the presence of the jury.

Draper was primarily concerned with the two social workers' testimony concerning the confrontation that occurred outside the Draper residence and believed it would be disproportionately prejudicial character evidence. When questioned about whether it was limited-purpose evidence, Draper suggested it would be difficult for the jury to follow such an instruction. The court was not convinced and allowed the testimony with the intent to give a limited-purpose instruction.

When the two social workers were called to the stand, they each testified to have witnessed Joe Jr. with one large bruise on his face with three long lines of bruising across it. The family was not able to provide them with any explanation for how Joe Jr. got the bruise. The social workers each separately explained that after that visit, they were very concerned with what they saw and that when they left the house that day, they were crying. The second social worker additionally testified to calling the child abuse hotline that evening.

When the second social worker to testify said that the social workers cried after leaving, Draper objected on the grounds of relevance and foundation. He had not objected earlier when the first social worker testified to leaving the house in tears. In ruling on his objection, the court allowed the testimony in over the objection, because it was "consistent with the evidence presented by the other witness that they cried."

The social workers also both testified about the unscheduled home visit where they had the altercation with Draper outside of his home. Draper timely renewed his objections in the presence of the jury, and the court gave the limiting instruction for the testimony that the jury was not to "consider it in relation to the character of . . . Draper, but [that they could] consider it for the limited purpose of other issues of what was going on in that house and who was in control in that house."

After not hearing from the family or about the status of their report for a few weeks, the social workers dropped by the Draper residence and one of them approached the fence surrounding the trailer home. Draper arrived at the gate before the social worker and would not let the social worker past the gate. He was very angry and aggressive when he spoke, because he believed that the social workers had reported his family to Child Protective Services. After an unpleasant exchange, Draper told the social workers to "get the [expletive] off of his property and to never come back." The social workers did not return to the property or ever hear back from the family.

### (ii) CFS Worker's Testimony

On a separate occasion where a report on the Draper residence was made to the child abuse hotline, one CFS worker made an unscheduled visit to follow up on the report and assess the family. The CFS worker testified that he pulled up to the house in a car with a "'Department of Health and Human Services'" decal on the side and approached the fence surrounding the property. At that point, Draper stopped the CFS worker at the gate and asked him who he was and why he was there. When the CFS worker explained why he was there, Draper was upset and initially did not want to let him inside. Draper eventually let the CFS worker inside but would not allow him full access to the home—he allowed the worker to observe the rooms but only from behind him while he stood in front of the doorway.

The CFS worker testified that during his assessment, Draper "had control of answering the questions and really control of the whole conversation." He also explained that he was unable to speak with Rinehart, Draper, and Nancy separately—as was his practice—because Draper "didn't think . . . that it was necessary. He had said that . . . they had nothing to hide . . . ." The CFS worker also testified that he had to instruct Draper to allow Rinehart to answer his questions,

because Draper would interject with a comment before she could answer the questions.

When the State asked the CFS worker whether he had "any concerns with the way in which . . . Draper treated [Rinehart] during the interview," Draper objected on relevance, foundation, and rule 404. Without discussion, the court overruled his objection. In answering the question, the CFS worker testified:

> [T]here was a point where [Draper] explained to me that [Rinehart] was not a good parent. Was not a good mother. He had made the statement that because of [Rinehart's] being a bad parent, now he and Nancy had to help with bringing up the children. He had stated that Nancy's job now was to care for the children. And she was not going to date or have a social life until after the children graduated from high school. He had made the statement that was kind of concerning that he didn't want [Rinehart] out whoring around while she had children at home.

The court gave no limiting instruction to the CFS worker's testimony as it had given for the two social workers' testimony. At the end of the trial, the court did give the following written limiting instruction: "During the trial I called your attention to some evidence that was received for specified limited purposes; you must consider that evidence only for those limited purposes and for no other. The limited purpose evidence may not be considered by you as evidence of [Draper's] character." The last line of that instruction was specifically edited to address Draper's earlier objection that some testimony may be construed as evidence of his character.

## 4. CONVICTIONS AND SENTENCES

The jury found Draper guilty on both counts—intentional child abuse resulting in death and intentional child abuse resulting in serious bodily injury. Intentional child abuse resulting in death is a Class IB felony[3] and is punishable

---

[3] Neb. Rev. Stat. § 28-707(6) (Cum. Supp. 2010).

by 20 years' to life imprisonment.[4] Intentional child abuse resulting in serious bodily injury is a Class II felony[5] and is punishable by 1 to 50 years' imprisonment.[6] The district court sentenced Draper to 60 years' to life imprisonment on the first count and 49 to 50 years' imprisonment on the second count, with the sentences to be served consecutively. According to the district court's sentencing advisement, Draper will not be eligible for parole until 2066.

### III. ASSIGNMENTS OF ERROR

Draper alleges that the district court erred in (1) finding sufficient evidence to convict him of child abuse resulting in death beyond a reasonable doubt; (2) finding sufficient evidence to convict him of child abuse resulting in serious bodily injury beyond a reasonable doubt; (3) overruling his objection on the basis of speculation and foundation about lay testimony concerning the cause of an injury to the victim's ear; (4) allowing improper rule 404 evidence to be adduced concerning his character; (5) allowing testimony concerning the emotional reaction of witnesses without proper foundation, and over his relevancy objection; and (6) giving him excessive sentences.

### IV. STANDARD OF REVIEW

[1] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[7]

---

[4] Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014).

[5] § 28-707(5).

[6] § 28-105 (Reissue 2008 & Cum. Supp. 2014).

[7] *State v. Newman*, 290 Neb. 572, 861 N.W.2d 123 (2015).

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[8] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[9]

[4,5] We will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[10] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[11]

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Draper alleges that there was insufficient evidence to support either of his convictions, because they were "based solely on the testimony of . . . Rinehart," and that "her testimony was unbelievable insomuch as she made incredible claims about what [Draper] did and how he did it."[12] He essentially argues that since Rinehart also could have caused the injuries to Joe Jr., she lacks credibility and that, as a result, her testimony is insufficient to sustain his conviction.

[6,7] This argument contradicts our standard of review. In reviewing a sufficiency of the evidence claim, we do not pass on the credibility of witnesses—that is for the trier of fact.[13]

---

[8] *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

[9] *Id.*

[10] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

[11] *Id.*

[12] Brief for appellant at 9.

[13] See *State v. Newman*, *supra* note 7.

The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[14]

[8] In addition to Rinehart's testimony, the State presented testimony of seven medical experts, two law enforcement officials, and four social workers to corroborate Rinehart's testimony concerning the alleged abuse and Joe Jr.'s injuries. Though Rinehart was the only witness to specifically point to Draper as the perpetrator of the abuse, this alone does not make the evidence insufficient. In fact, Nebraska has a long-standing rule that a defendant's conviction of a crime may be based on uncorroborated testimony of a single witness.[15] Here, Rinehart's testimony was corroborated and it was not rebuked by any contrary testimony.

Viewed in the light most favorable to the State, and without passing on the credibility of witnesses, we find that there was sufficient evidence for any rational juror to find Draper guilty beyond a reasonable doubt for the crimes for which he was convicted. Accordingly, Draper's assignment of error is without merit.

## 2. ALLEGED IMPROPER TESTIMONY

Draper assigns error to a few instances of testimony admitted over objection. We review them in the context of a 6-day trial and a record of over 700 pages. And whether they are viewed individually or collectively, we reach the same conclusion.

### (a) Testimony Concerning Ear Injury

Draper assigns that the district court erred in allowing Rinehart to testify as to the cause of an injury above Joe Jr.'s ear. Rinehart admitted that she did not see the injury occur,

---

[14] *Id.*

[15] See, e.g., *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011); *State v. Loveless*, 234 Neb. 463, 451 N.W.2d 692 (1990). See, also, *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999).

and for that reason, Draper argues her statement that the injury was caused by the bed railing was mere speculation and improper lay opinion testimony.

[9] Assuming without deciding that it was error for the district court to overrule Draper's objection to the testimony, the error was harmless. Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[16]

Here, the guilty verdict was surely unattributable to any error in admitting the evidence regarding the bruise above Joe Jr.'s ear. The State presented evidence of old rib fractures, a recent skull fracture, a recent pelvic fracture, strain injuries on the arms and shoulders, and a ruptured bowel to support its allegations of child abuse resulting in serious bodily injury and death. Additionally, medical experts testified that the cause of the injuries was likely the result of abuse or outer trauma. The identification of additional bruising was merely collateral. Accordingly, any error in allowing Rinehart's statement concerning the cause of the bruise into evidence was harmless.

### (b) Rule 404 Evidence

At trial, two social workers were allowed to testify to an interaction with Draper during an unscheduled visit where Draper was angry and hostile because he believed they had reported his family to Child Protective Services. Prior to their testimony, Draper had unsuccessfully argued that their testimony should be excluded as improper character evidence. A CFS worker also testified to a separate unscheduled visit to the Draper residence. Over Draper's relevance, foundation, and rule 404 objections, the CFS worker was allowed to testify as

---

[16] *State v. Cullen, supra* note 10.

to his concern for a few comments Draper made about Rinehart as a mother.

Draper assigns that the district court erred in overruling his objections to the testimony of these three witnesses and argues that the testimony should have been excluded. He alleges that the testimony was not relevant, was unduly inflammatory and prejudicial, and could only have been offered to portray him as a "vi[le] and aggressive individual."[17]

Again, assuming without deciding that it was error for the district court to overrule Draper's objections, the error was harmless. The guilty verdict was surely unattributable to any error in admitting the allegedly improper character evidence.

### (c) Testimony Concerning Emotional Reaction of Witnesses

Draper also assigns that the district court erred in allowing the second social worker to testify, over his objection, that the social workers left the Draper residence and cried after one home visit. Assuming without deciding that it was error for the district court to overrule his objection, the error was harmless.

[10] The first social worker had already testified to the same—that the social workers left the residence in tears—and Draper did not object at that time. Generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[18] Because Draper failed to object to the first social worker's similar testimony, it was harmless error for the district court to allow the second social worker's testimony concerning their emotional reaction after the home visit.

---

[17] Brief for appellant at 12.

[18] *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016).

### 3. Excessive Sentences

Lastly, Draper alleges that he received excessive sentences because the district court "essentially imposed a double life sentence."[19] He was convicted of one count of intentional child abuse resulting in death—a Class IB felony,[20] punishable by 20 years' to life imprisonment[21]—and one count of intentional child abuse resulting in serious bodily injury—a Class II felony,[22] punishable by 1 to 50 years' imprisonment.[23] He was sentenced to consecutive terms of 60 years' to life imprisonment and 49 to 50 years' imprisonment for the first and second counts, respectively. As such, his sentences are within the statutory limits.

[11,12] In reviewing a sentence imposed within the statutory limits, an appellate court considers whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[24] When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[25]

Draper argues that the sentences were "somewhat excessive" based on his current circumstances and his lack of a criminal record.[26] At the time of sentencing, Draper was

---

[19] Brief for appellant at 17.

[20] § 28-707(6).

[21] § 28-105 (Cum. Supp. 2014).

[22] § 28-707(5).

[23] § 28-105 (Reissue 2008 & Cum. Supp. 2014).

[24] See *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016).

[25] *Id.*

[26] Brief for appellant at 17.

51 years old, with no prior criminal record. At trial, Draper elicited testimony from his family physician confirming that he suffered from multiple sclerosis and was taking several medications to treat the symptoms of the disease. He also presented evidence that he had limited mobility and had decreased vision and deafness from the disease.

[13] The evidence also clearly establishes the severity of the offense and the violence necessary to cause the fatal injuries to the 2-year-old child in this case. As there is no evidence that the district court failed to consider these factors in determining Draper's sentences, and given that, traditionally, a sentencing court is accorded very wide discretion in determining an appropriate sentence,[27] we find that the court did not abuse its discretion in imposing Draper's sentences.

## VI. CONCLUSION

We conclude that the jury's verdicts were supported by the evidence, that any error in admitting testimony over Draper's objections was harmless, and that the district court's sentences did not constitute an abuse of discretion. For these reasons, we affirm the judgment of the district court.

AFFIRMED.

---

[27] *State v. Miller*, 284 Neb. 498, 822 N.W.2d 360 (2012).