IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. PARNELL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

KEINALD V. PARNELL, ALSO KNOWN AS REGINALD V. PARNELL, APPELLANT.

Filed December 13, 2016.    No. A-16-354.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Julie A. Frank for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

Reginald V. Parnell, pro se.

INBODY and PIRTLE, Judges, and MCCORMACK, Retired Justice.

MCCORMACK, Retired Justice.

## I. INTRODUCTION

Keinald V. Parnell, also known as Reginald V. Parnell, appeals his convictions and sentences for burglary, terroristic threats, and first degree false imprisonment. On appeal, Parnell alleges that there was insufficient evidence to support his convictions and that he received excessive sentences. Upon our review, we find no merit to Parnell's arguments, and we affirm.

## II. BACKGROUND

Parnell was charged with burglary, terroristic threats, first degree false imprisonment, two counts of use of a firearm to commit a felony, possession of a firearm by a prohibited person, and misdemeanor violation of a protection order. The State also alleged that Parnell was a habitual

criminal. Parnell pled guilty to the violation of a protection order and proceeded to trial on the remaining six charges.

The evidence at trial showed that in the early morning hours of May 9, 2015, Parnell entered the house of his ex-girlfriend, Randie Frederick. Randie was not home, but her adult son, Dominic Frederick, was asleep in the living room. Dominic's two children, who also lived in the house, were not at home that night. Parnell brandished a knife and, Dominic later claimed, a gun, and forced Dominic to remain in the living room of the house until the morning hours. In the morning, Dominic's uncle came by the house after receiving no answer to phone calls to Dominic's cellphone. The uncle saw Dominic sitting on a couch inside the house and saw another figure in the house, but left without speaking to Dominic. Shortly thereafter, the Fredericks' next door neighbor saw a broken window on the Fredericks' house and called the police. Following the police's arrival, Dominic was able to safely exit the house and an hours-long standoff between Parnell and police ensued. Parnell was eventually apprehended in the attic of the house and arrested.

On the day of Parnell's arrest, police collected a knife and a glove from the Fredericks' home. Two days later, Dominic summoned the police back to his house to retrieve a second knife he claimed to have found in the attic. Eleven days later, police returned to the house with special equipment and located a gun in the basement drywall.

The jury found Parnell guilty of burglary, false imprisonment, and terroristic threats, and acquitted him of the three firearms charges.

The court ordered a presentence investigation and conducted an enhancement hearing. The court found Parnell to be a habitual criminal and sentenced him to 30 to 30 years for burglary, 30 to 30 years for terroristic threats, 30 to 30 years for false imprisonment, and one year for violation of a protection order. The court ordered that all four sentences be served concurrently and awarded Parnell credit for 327 days served.

Parnell appeals. Additional facts will be discussed, as necessary, in the analysis section below.

## III. ASSIGNMENTS OF ERROR

Parnell alleges that there was insufficient evidence to support his convictions for burglary, terroristic threats, and false imprisonment. He also alleges that he received excessive sentences for these three convictions.

We also note that Parnell submitted two pro se briefs on appeal. Parnell's first pro se brief does not contain assigned errors or an argument section and, as such, does not comply with the rules of appellate practice for the formatting of briefs. See Neb. Ct. R. App. P. § 2-109(D). Parnell's second pro se brief contains two assignments of error: that there was insufficient evidence to support Parnell's convictions and that the district court engaged in "Judicial Bias" at the preliminary hearing. Parnell's argument pertaining to the insufficiency of the evidence echoes Parnell's counsel's argument on the same issue. There is no argument pertaining to Parnell's second pro se assignment of error of judicial bias. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015). Accordingly, because

- 2 -

Parnell's pro se arguments either mirror those asserted by his attorney or fail to comply with our court rules, we do not separately address them.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016).

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Parnell first argues that the State failed to present sufficient evidence to sustain his convictions for terroristic threats, false imprisonment, and burglary. With respect to his convictions for terroristic threats and false imprisonment, Parnell argues that the State's main witness, Dominic, was unreliable and that his testimony was therefore inadequate to support the jury's guilty verdicts. With respect to his conviction for burglary, Parnell argues that the State failed to prove that he entered the Frederick home with the requisite intent to steal property or to commit a felony. We find no merit to either of Parnell's assertions regarding the sufficiency of the evidence.

In reviewing a sufficiency of the evidence claim, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

We will address Parnell's two arguments regarding the sufficiency of the evidence in turn.

### (a) Terroristic Threats and False Imprisonment

Parnell argues that there was insufficient evidence to supports his convictions for terroristic threats and false imprisonment because Dominic's testimony was not believable. Parnell points to numerous inconsistencies in Dominic's testimony including whether Dominic arranged to have his children out of the house the night of the incident or whether his mother-in-law volunteered to take them, whether he went out with friends or stayed in, how Dominic was able to see his uncle through a window while sitting on the couch, whether Parnell held the knife the entire time or put it in his pocket at times, whether Dominic remained seated the entire time or walked around, which of the two knives police seized was the one Parnell used, when Dominic's children returned home

after the incident, and whether Dominic was frightened during the incident or not. We find no merit to this assignment of error.

The State presented the testimony of numerous witnesses, including several police officers, at the trial. The officers described the hours-long standoff with Parnell and how they eventually entered the house and arrested him, using flash bangs, a PA system, a police robot, a police dog, and a SWAT team. The remainder of the officers' testimony related to locating the two knives and gun in the Fredericks' home in the hours and days after the standoff.

Officer RoseMary Henn testified that she transported Dominic for a formal police interview after the standoff was over. After Dominic's interview, Henn drove Dominic back to his house. Upon entering the house, Dominic informed Henn that a flip knife and a glove on the coffee table were from the incident. Officer Henn seized the items as evidence. Officer Henn then helped search the attic but did not locate any additional evidence.

Officer Derek Vieth testified that on May 11, 2015, two days after the incident with Parnell, Dominic summoned police back to his house. When Officer Vieth arrived, Dominic informed him that he had found another knife, this time in the attic. Dominic had removed the knife from the attic and placed it on top of his kitchen cabinet. Officer Vieth summoned the crime lab to collect the knife.

Todd Morgan, a crime lab technician, testified that he collected and tested the knife Officer Vieth had located on top of the cabinet. According to Morgan, no latent prints were found on the knife.

Officer Charles Moffitt testified that on May 20, 2015, he returned to the Fredericks' home to assist in locating a weapon that was believed to still be in the house. Moffitt used an optic camera with a scope to locate a gun in a hole in the basement drywall. Moffitt testified that someone had directed his attention to the drywall, but that he could not remember who.

Kimberly Van Den Akker, a crime lab technician, testified that she collected and tested the firearm Moffitt had located in the basement. According to Van Den Akker, no fingerprints were found on the gun. The parties stipulated that DNA located on the gun's magazine excluded Parnell as a contributor, but DNA located on the gun could not exclude Parnell as a contributor.

The State also presented the testimony of Kevin Watkins, Dominic's uncle. Watkins testified that on the night of May 8, 2015, he was supposed to spend time with Dominic but ended up falling asleep early. On the morning of May 9, Watkins tried calling Dominic around 8 a.m. but received no response. Watkins then went to Dominic's house around 9 a.m. Watkins knocked on two doors, and was eventually able to see Dominic inside through a window. Watkins made eye contact with Dominic and testified that Dominic "didn't look normal." Watkins also saw another person in the house, though he could only see the back of the person's head. Watkins eventually left the house, figuring that Dominic was upset with him for not spending time with him the night before.

The State also called Jay Julin, the neighbor who called the police. Julin testified that he is the neighbor and landlord to the Fredericks. On the morning of May 9, 2015, he was mowing the lawn and saw somebody (presumably Watkins) looking into the windows of the house, which he found suspicious. Julin also noticed a broken window on the Fredericks' house. Julin tried to call Dominic but received no response. Julin then called the police. Julin testified that when they

arrived, officers tried knocking on the door but received no response. Eventually, Dominic came to the door and officers pulled him outside. Julin described Dominic as looking "[v]ery anxious" upon his removal from the house.

The State's key witness was Dominic. Dominic testified that he lives at the house with his mother, Randie, and his two children. According to Dominic, Randie was out of town the weekend of May 9, 2015, on business and Dominic had his mother-in-law watch his children. Dominic had plans to hang out with his Uncle Kevin and a friend and go to a party on the night of May 8. Dominic testified that he ended up hanging out with his friend and the pair just stayed in at Dominic's house and "had a couple shooters, smoked a blunt." Dominic testified that he fell asleep in the living room around 11:30 or midnight.

According to Dominic, he awoke around 3 a.m. to use the bathroom. In the corner of the room by the bathroom, Dominic saw a silhouette. Dominic testified that at first he thought it was a friend playing a joke on him, but then he saw the person was bald and knew it must be Parnell. Parnell had a gun in his hand and made Dominic return to the couch. According to Dominic, Parnell said that he wanted to talk to Randie and that they would "wait for your mom." Dominic testified that Parnell also had a 2- to 3-inch pocket knife with a blade that folded out in his other hand. Dominic testified that the pair remained in the living room until the next morning when the police arrived. According to Dominic, he and Parnell discussed their problems with women during this time. Dominic testified that Parnell did not set the gun down, and had the knife in his other hand. Dominic then testified that at one point, Parnell got them beers from the fridge and also let Dominic use the bathroom.

Dominic testified that in the morning, his uncle knocked on the door. Parnell became agitated when Watkins knocked, and he threatened to "pop" Dominic and "put one in [Watkins'] dome" if Dominic let him in. Dominic testified that he made eye contact with his uncle through the window, but did not say anything because he wanted Watkins to remain safely outside. Dominic testified that the police arrived a short while later and began knocking on the door. Dominic described Parnell as "unstable" once the police arrived, including walking around the house shutting all the blinds. Dominic testified that he offered to tell the police that there was no problem, and Parnell let him exit the house. Dominic testified that the police pulled him to the ground once he exited the house.

Dominic testified that once the standoff with Parnell was over, Dominic was transported for a formal police interview. Dominic testified that after the interview, he and an officer returned to his house to search for the weapons. Dominic testified that he found a glove in his daughter's room and a knife in the front room in "a mixture of everything" because the police had "trashed" the house during their encounter with Parnell. Dominic testified that the knife he found that first day was not the same knife Parnell used during the incident because the knife Parnell had wielded was a different color.

Dominic testified that in the days after the event, he kept searching the house for the missing weapons. He testified that he found a knife in the attic insulation that he recognized as the knife Parnell had used. Dominic also identified the gun found in the basement drywall as being the same firearm Parnell had used.

On cross-examination, Parnell's attorney used a prior deposition of Dominic and his police interview to impeach his trial testimony. In particular, Dominic had stated in the deposition that his mother-in-law had "mysteriously" offered to take his kids on the weekend of May 9, not that he asked her to watch the kids. Dominic had also stated at one point that his children did not come home until after the gun was found, but later said they returned home a few days after the incident, after the second knife was found, but before the gun was found. Additionally, Dominic told the interviewing detective that he had gone out with his friends earlier in the night on May 8 rather than staying at home the entire time. Parnell's attorney also questioned how Parnell could have held a gun and a knife during the entire incident while also retrieving and drinking beers. Dominic responded that Parnell put the knife in his pocket at times and explained that he was confused by the attorney's question because she had not been asking about Parnell retrieving the beers at the time.

Parnell's attorney also revealed that Dominic had earlier been inconsistent about which of the two knives had been the one Parnell had used. Additionally, Dominic had earlier described Parnell as calm, not violent, and had stated that he sympathized with Parnell. Lastly, Dominic admitted that he had not remained seated on the couch during the entire encounter, but had gotten up and moved around at times.

It is true that Parnell's attorney impeached Dominic's testimony and revealed several inconsistencies between his earlier statements and trial testimony. However, many of these inconsistencies were on relatively minor details, such as why Dominic's children were not at home, whether Dominic went out with friends or stayed in before Parnell's arrival, and when Dominic's children returned to the home. Dominic's testimony was consistent in identifying Parnell as the person who entered the house in the middle of the night, brandished a knife, and refused to let Dominic leave. The jury saw Dominic testify and apparently determined that, despite the inconsistencies, his overall story of Parnell holding Dominic at knifepoint was credible. Parnell's argument asking us to find insufficient evidence based on allegedly incredible testimony contradicts our standard of review. In reviewing a sufficiency of the evidence claim, we do not pass on the credibility of the witnesses--that is for the trier of fact. *State v. Draper*, 295 Neb. 88, 886 N.W.2d 266 (2016).

Parnell also points out that the jury apparently did not believe Dominic's testimony that Parnell had a gun because it acquitted him of the three firearms-related charges. However, this does not mean that there was insufficient evidence by which the jury could have found Parnell guilty of the remaining three charges based on the theory that Parnell had a knife. Construing the evidence in the light most favorable to the State, a rational jury could have found Parnell guilty of terroristic threats and false imprisonment.

(b) Burglary

Parnell next argues that there was insufficient evidence to support his conviction for burglary. Parnell argues that there was no evidence that he entered the house with the requisite intent. We find no merit to this assignment of error.

A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or

with intent to steal property of any value. Neb. Rev. Stat. § 28-507 (Supp. 2015). Intent sufficient to support a conviction for burglary may be inferred from the facts and circumstances surrounding an illegal entry. *State v. Nero*, 281 Neb. 680, 798 N.W.2d 597 (2011).

The State argued that Parnell broke a window and entered the Fredericks' house with either the intent to take money or with the intent to commit terroristic threats.

Dominic testified that upon entering the home, Parnell said that Randie owed him money and that he was there to see her for that reason. Dominic testified that he offered Parnell money, but Parnell refused it, stating that Randie was the one who should pay him.

Parnell argues that he could not have entered the home with the intent to steal property because he did not eye any property in the home and refused to take the money Dominic offered him. However, Dominic testified that Parnell *was* seeking money, but wanted Randie to pay him, not Dominic. Therefore, there was sufficient evidence by which the jury could have found that Parnell entered the home with the intent to steal money from Randie.

Parnell further argues that he could not have had the intent to commit terroristic threats when he entered the home because he did not know that Dominic would be present. The evidence at trial showed that, although Parnell may not have known who was present in the home, he nevertheless broke a window, entered the house in the middle of the night, and carried a knife while doing so. Accordingly, there was sufficient evidence by which the jury could have found that Parnell entered the home with the intent to threaten someone inside, even if he was not aware of the exact identify of the victim yet.

## 2. EXCESSIVE SENTENCES

Lastly, Parnell argues that he received excessive sentences. Parnell does not challenge the court's finding that he is a habitual criminal, but rather argues that the court failed to consider mitigating factors. Specifically, Parnell points to his traumatic childhood and the fact that, at age 45, he is at a much lower risk of recidivism. We find no merit to this assignment of error.

When imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education and experience, social and cultural background, past criminal record, and motivation for the offense, as well as the nature of the offense and the violence involved in the commission of the crime. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011).

Parnell was found to be a habitual criminal with respect to his convictions for terroristic threats, false imprisonment, and burglary. The minimum sentence for being a habitual criminal is 10 years and the maximum sentence is 60 years. Neb. Rev. Stat. § 29-2221 (Reissue 2008). Parnell was sentenced to 30 to 30 years on all three counts. Because Parnell's sentences fall within the statutorily provided sentencing range, we review his sentences only for an abuse of discretion.

At Parnell's sentencing hearing, the district court noted that it had received and reviewed the presentence report. The presentence report revealed that Parnell had an extensive criminal history, dating back to his time as a juvenile. Parnell's attorney also spoke at the sentencing hearing. She emphasized that Parnell had suffered trauma at a young age because two of his brothers had died and Parnell had been a witness to domestic violence. Parnell's attorney also argued that the minimum sentence of 10 years would have Parnell being released from jail at an age where his risk of recidivism was greatly reduced.

The court indicated that it had considered all of the information and argument presented at the sentencing hearing, including the relevant statutory factors and the presentence report. The court classified Parnell's record as "pretty bad," noting that he had over six prior felonies and had previously been convicted of being a habitual criminal. The court also noted that the nature and circumstances of the case were violent and could have resulted in more serious charges. The court concluded that a lengthy sentence was in order.

The record reflects that the district court considered all the relevant factors in determining Parnell's sentences. In particular, the court heard and considered argument from Parnell's attorney regarding his traumatic past and his lower risk of recidivism. Despite considering these mitigating factors, the court determined that Parnell's extensive criminal history and the violence involved in the current offenses required a lengthier prison sentence. Accordingly, we cannot say that the district court abused its discretion in sentencing Parnell to three concurrent terms of 30 to 30 years.

## VI. CONCLUSION

There was sufficient evidence to support Parnell's convictions for burglary, terroristic threats, and false imprisonment. Additionally, the district court did not impose excessive sentences on Parnell. Accordingly, we affirm Parnell's convictions and sentences.

AFFIRMED.